**ORGANIZATIONS UNITED FOR ECOLOGY et al., Plaintiffs,**

v.

**Griffin B. BELL, Attorney General of the United States, et al., Defendants.**

Civ. No. 77–729.

United States District Court, M. D. Pennsylvania.

Jan. 30, 1978.

John D. Killian, Joseph A. Layman, Jr., Killian & Gephart, Harrisburg, Pa., for plaintiffs.

Joseph F. Cimini, Lewisburg, Pa.; Lawrence R. Liebesman, Land & Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for defendants Bell, Carlson and Jensen.

John P. Krill, Jr., Harrisburg, Pa., for defendant Dept. of Environmental Resources.

Robert J. Wollet, Williamsport, Pa., for defendants Lycoming County Commissioners.

## OPINION

MUIR, District Judge.

### I. Introduction.

Plaintiffs filed this action on August 10, 1977, alleging that Griffin B. Bell, Attorney General of the United States, Norman A. Carlson, Director of the United States Bureau of Prisons, Department of Justice, and Eldon Jensen, Superintendent of Allenwood Prison Camp, had violated the National Environmental Policy Act, (sometimes hereafter NEPA), 42 U.S.C.A. §§ 4331 et seq. because they had not prepared an Environmental Impact Statement (sometimes hereafter EIS), before the decision was made to grant a permit allowing the Commissioners of Lycoming County, Pennsylvania to build a landfill on land owned by the United States of America and used in connection with the operation of the Allenwood Prison Camp. On October 31, 1977, this Court granted the motion of the Department of Environmental Resources of the Commonwealth of Pennsylvania (sometimes hereafter DER) to intervene as a Defendant. On November 9, 1977, this Court granted the motion of the Lycoming County Commissioners to intervene as a Defendant to this action. The Plaintiffs request that the Court enjoin construction and use of the landfill at the Allenwood Prison Camp for the disposal of solid wastes until an Environmental Impact Statement is prepared by the United States Bureau of Prisons.

On November 1, 1977, a pre-trial conference was held to determine what issues should be decided by the Court in order to rule upon the Plaintiffs' request for an injunction. The parties agreed that the Court should decide the following five issues:

(1) Standing of the Plaintiffs to bring this action;

(2) Possible laches barring the Plaintiffs' claim;

(3) Whether the permit of June 5, 1973 was a major federal action significantly affecting the human environment;

(4) Whether the procedure used by the Bureau of Prisons in allowing the Environmental Protection Agency (sometimes hereafter EPA) to conduct the environmental review met the Bureau's responsibility under the applicable statute; and

(5) Whether the equities are in favor of the project as opposed to the Plaintiffs' claim.

This case was originally listed for trial in November, 1977. However, because the entire month of November was devoted to the trial of a single case, the above-captioned action was transferred to the January, 1978 list. The trial concerning the issue of laches commenced before the undersigned judge sitting without a jury on January 12, 1978 and ended on January 20, 1978, a period of seven trial days. Counsel for the Plaintiffs agreed that this hearing was to be both for the Plaintiffs' request for a preliminary injunction and a permanent injunction. The Court informed the parties on the last day of trial that if a decision favorable to the Plaintiffs concerning laches was rendered, the next issue would be tried in March, 1978 because the Court is scheduled to try 22 cases in Scranton in February, 1978. The following are the Court's findings of fact, discussion, and conclusions of law concerning laches.

## II. Findings of Fact.

1. In 1942 and 1943 the United States of America acquired title to approximately 4,238 contiguous acres of land located in Brady Township, Lycoming County, and Gregg Township, Union County, Pennsylvania. The land was subsequently made a part of the Federal Prison System of the Department of Justice and is generally referred to as "Allenwood Prison Camp." (Undisputed)

2. In 1969, Federal Bureau of Prison officials initiated planning to develop a sanitary landfill at Allenwood Prison Camp for the exclusive use of Allenwood Prison Camp and the Federal Penitentiary at Lewisburg, Pennsylvania. (Undisputed)

3. On or about February 13, 1972, the Bureau of Prisons entered into a contract with Gilbert Associates, Inc. to investigate possible sites for a landfill at Allenwood Prison Camp to receive the solid wastes from the Camp and from the penitentiary at Lewisburg.

4. On or about February 29, 1972, the Bureau of Prisons ordered ten staff houses located in close proximity to the proposed landfill site to be vacated for razing. (Undisputed)

5. On April 27, 1972, the Director of the Bureau of Prisons cited as another factor which entered the picture with regard to disposition of the houses that:

"One of the sites under consideration for the possible regional sanitary landfill requested by Susquehanna Economic Development Association (SEDA) comes dangerously close to the present housing site. If the regional landfill concept is ultimately approved and located at the proposed prime site, it would make the present housing area somewhat undesirable." (Undisputed)

6. On March 27, 1972 a meeting was held in the office of the Bureau of Prisons' Supervising Architect, George W. Aderhold, attended by representatives of SEDA, of the Leonard S. Wegman Company, Inc., consulting engineer for the Association, and of the Pennsylvania Department of Environmental Resources, at which the Bureau of Prisons advised that Allenwood Camp lands would be made available if the Bureau Director approved the permit subject to appropriate environmental review and approval by relevant federal and state agencies. (Undisputed)

7. On March 29, 1972, SEDA wrote to the Bureau of Prisons stating that the envisioned landfill at Allenwood would be used as a deposit site for municipal solid waste generated by "at least 250,000 of our region's population." SEDA further stated: "In this manner we could foresee as much

as 900 tons per day of waste materials coming to the camp site." (Undisputed)

8. In April, 1972 certain residents of the townships in close proximity to the Allenwood Prison Camp wrote to the Bureau of Prisons expressing concern over the establishment of a regional municipal landfill. (Undisputed)

9. By letter dated June 19, 1972, addressed to the Bureau of Prisons, the Bureau's engineers, Gilbert Associates, Inc., concluded as follows:

"In summary it is the opinion of the consultant that Site B can be made into an acceptable sanitary landfill facility provided certain measures are taken to prevent surface and ground water pollution. Without such controls, however, the site would be unacceptable."

The letter also observed:

"As noted in the report, we feel that Site B can be used as a regional facility provided that a number of measures are taken to prevent ground and surface water pollution."

(Undisputed)

10. Under date of October 16, 1972, Gilbert Associates, Inc. submitted both to the Lycoming County Commissioners and to SEDA a report on the economic feasibility of using a certain site at the Allenwood Federal Prison Camp as a regional sanitary landfill facility. (Undisputed)

11. The project involved is the Lycoming County Solid Waste Facilities Complex, commonly known as the Allenwood Sanitary Landfill, situated on the south slope of Penny Hill west of U.S. Route 15 in Brady Township, Lycoming County, Pennsylvania. (Undisputed)

12. The project is being constructed by the Lycoming County Commissioners as a result of the obligations incurred under the Lycoming County Solid Waste Management Plan and contracts between municipalities and the Board of County Commissioners.

13. Obligations incurred under the Lycoming County Solid Waste Management Plan and the contracts with municipalities require the County Commissioners to develop those facilities and manage a system which will solve the solid waste problems in Lycoming County.

14. The Lycoming County Commissioners, in planning and constructing this landfill, have acted on behalf of certain municipalities in the county to comply with the mandates of the Pennsylvania Solid Waste Management Act, Act of July 31, 1968, P.L. 788, No. 241 § 1, 35 P.S. §§ 6001 et seq. which is administered by DER.

15. The project site constitutes some one hundred thirty (130) acres, more or less, as referenced in the extract of the U.S. Geodetic Survey Map shown as Attachment "A" to the Bureau of Prisons Permit, with the ownership of said site vested in the Federal Bureau of Prisons, United States Department of Justice. (Undisputed)

16. The Lycoming County Solid Waste Facilities Complex is being constructed pursuant to the provisions of a permit to use land owned by the Bureau of Prisons, issued by the Bureau on June 5, 1973. The permit agreement contained the following language in paragraph 6:

"THAT the Commissioners shall be permitted to use such lands for a public landfill and related uses (solid waste processing and leachage [sic] treatment), conditioned upon the approval of said site and operation, by the Pennsylvania Department of Environmental Resources and the Federal Environmental Protective [sic] Agency, so long as such site, or any additional sites added thereto, shall be needed as landfill, and so long as such landfill continues to have the approval of the Pennsylvania Department of Environmental Resources and the Federal Environmental Protective [sic] Agency."

(Undisputed)

17. The landfill has been and will be developed in fields of several acres each.

18. The project involved arose in part because of the need for the Federal Bureau of Prisons to develop a proper disposal facility for wastes generated at the Allenwood Federal Prison Camp and at the United States Penitentiary, at Lewisburg, Pennsylvania. (Undisputed)

19. Under date of February 1, 1972, W. R. Kauffman, P.E., the Program Director, Environmental Quality Development, for SEDA, wrote to the Honorable Herman T. Schneebeli, then Representative for the 17th Congressional District, seeking negotiations with the United States Department of Justice to use parts of the Allenwood Federal Prison Camp for a Lycoming County sanitary landfill site. (Undisputed)

20. Under date of February 11, 1972, Congressman Schneebeli referred the W. R. Kauffman letter of February 1, 1972 to Norman A. Carlson, Director of the Federal Bureau of Prisons. (Undisputed)

21. Under date of March 6, 1972, a letter was sent to W. R. Kauffman from the Federal Bureau of Prisons scheduling a meeting for 2:00 P.M. on March 27, 1972 in Washington, D.C. to discuss solid waste disposal problems. (Undisputed)

22. As early as April of 1972 articles appeared in both the *Williamsport Sun-Gazette* and *Grit* newspapers indicating the possibility of a sanitary landfill being constructed on Allenwood Federal Prison Camp lands. (Undisputed)

23. The White Deer Valley Citizens Committee was aware of the fact that the Federal Bureau of Prisons was considering making available Allenwood Camp lands to Lycoming County for the purpose of a sanitary landfill as early as April of 1972.

24. Under date of April 7, 1972, Gilbert Associates, Inc. submitted to the Federal Bureau of Prisons a preliminary engineering report concerning the development of a sanitary landfill at the Allenwood Federal Prison Camp. (Undisputed)

25. Plaintiffs include individuals who have been members of the White Deer Valley Citizens Committee and Organizations United for Ecology (sometimes hereafter OUE). (Undisputed)

26. Plaintiff OUE is an organization which includes the White Deer Valley Citizens Committee. (Undisputed)

27. Plaintiffs were aware, or should have been aware, during 1973 that the Director of the Federal Bureau of Prisons had actually granted a permit to the Lycoming County Commissioners for a site on Allenwood Federal Prison Camp lands to be used as a sanitary landfill to be constructed and operated by the Commissioners and knew, or had reason to know, during 1973, of the contents of the permit.

28. Plaintiff Organizations United for Ecology was aware of the Bureau of Prisons permit to the Lycoming County Commissioners at its second meeting, on June 4, 1974. (Undisputed)

29. Plaintiff Organizations United for Ecology knew, as of August 8, 1974, that the Federal Bureau of Prisons had not prepared an Environmental Impact Statement (EIS) prior to executing the permit with the Lycoming County Commissioners. (Undisputed)

30. Plaintiff Organizations United for Ecology was aware as early as August 5, 1974 of the present cause of action alleging violations of the National Environmental Policy Act, 42 U.S.C.A. §§ 4331 et seq. (NEPA) by the Federal Bureau of Prisons. (G38)

31. All Plaintiffs were aware, or should have been aware, at least as early as August of 1974, of the complaint that the Federal Bureau of Prisons was allegedly not in compliance with the National Environmental Policy Act.

32. To this date, the Bureau of Prisons has not prepared an EIS. (Undisputed)

33. Attorney John C. Sullivan, then counsel for Plaintiffs, advised the members of OUE by letter shortly before OUE's meeting of August 26, 1974 that "It would be necessary to file suit on (sic) the federal court to deter further steps to construct a landfill prison camp site." (Minutes 8/26/74 O.U.E. meeting, p. 4)

34. A motion to accept the attorney's advice was carried at the same meeting, (Minutes 8/26/74 O.U.E. meeting, p. 4) and this motion was never rescinded.

35. Plaintiff Organizations United for Ecology complained at least as early as August of 1974 that the Federal Bureau of

Prisons was not in compliance with the National Environmental Policy Act. (Undisputed)

36. To this date, the Bureau of Prisons has. not prepared a negative declaration. (Undisputed)

37. On October 18, 1974, the Bureau of Prisons requested that the Environmental Protection Agency "act as Federal lead agency on all matters pertaining to the above project." (Undisputed)

38. Alessi D. Otte, representing EPA, attended the hearings before the Pennsylvania Environmental Hearing Board concerning the appeal from the issuance of the landfill permit and at one hearing asked Elizabeth Steward, Chairman of OUE, for comments about the environmental impact of the landfill and she declined to provide this information.

39. The EPA official responsible for conducting the environmental review and analysis of the Allenwood landfill was Alessi D. Otte who was project officer for the Allenwood landfill project up to May 27, 1976.

40. Mr. Otte's qualifications at the time of the EPA's environmental review included a B.S. degree in Civil Engineering and advanced studies in the area of Environmental Engineering; after graduation from the University of Alaska in April of 1973, he worked for R & M Engineering and Geological Consultants of Fairbanks, Alaska, in the areas of soil mechanics and sanitary engineering; in December of 1973, he started to work for the EPA, Office of Solid Waste Management Programs, in Washington, D.C.; between December, 1973 and April, 1975 he performed various duties related to the study of leachate treatment and collection from sanitary landfills; some of these duties included being project officer on leachate monitoring contracts, and various work related to leachate damage assessment; and he has been a member of the Environmental Protection Agency Vinyl Chloride Task Force since February, 1974.

41. Mr. Otte performed an environmental review pursuant to the then applicable EPA regulation, 40 C.F.R. Part 6, 38 Fed. Reg. 1696 (January 17, 1973), which implemented the National Environmental Policy Act.

42. Under date of November 1, 1974, Mr. Alessi D. Otte, Project Officer, United States Environmental Protection Agency, wrote to Dorothy Corson, Secretary, Organizations United for Ecology, asking for the Organization's comments on any possible environmental effects from the proposed sanitary landfill. The letter of Otte dated November 1, 1974 was read orally at an open meeting of O.U.E. on November 12, 1974. (G94) (Undisputed)

43. The EPA did not receive any response from the November 1 letter sent to the Organizations United for Ecology, because OUE's counsel advised it not to answer.

44. On November 20, 1974, the EPA agreed to "act as the lead agency on all matters for this project." (Undisputed)

45. Under date of December 20, 1974, Mr. Otte wrote to Mrs. Elizabeth Steward, Chairman, Organizations United for Ecology, presenting Federal funding information on the proposed project. (Undisputed)

46. After performing an environmental review, Mr. Otte concluded that the Lycoming County landfill would not have any significant adverse environmental impact.

47. Mr. Otte recommended that the Environmental Protection Agency issue a negative declaration to the effect that the project did not require the preparation of an Environmental Impact Statement.

48. The negative declaration was accompanied by a detailed "environmental appraisal" which set forth the reasons supporting the conclusion that a negative declaration should be issued.

49. The Environmental Protection Agency's appraisal is 95 pages long and has 23 exhibits.

50. The Environmental Protection Agency's environmental appraisal has the following format:

Chapter 1—Project Identification
Chapter 2—Project Description

Chapter 3—Probable Impact of the Project on the Environment

Chapter 4—Any Probable Adverse Environmental Effects Which Cannot be Avoided

Chapter 5—Alternatives Considered With Evaluation of Each

Chapter 6—Short Term Use versus Long Term Productivity

Chapter 7—Irreversible and Irretrievable Commitment of Resources

Chapter 8—Public Objections to Project and their Resolutions

Chapter 9—Agencies Consulted About the Project

51. Three alternatives to the project which were considered in the environmental appraisal are:

A. No action.

B. The County implementing an alternative system.

C. The County implementing the proposed project at a different location.

52. Mr. Otte's recommendation was adopted by the EPA on April 4, 1975, on which date the negative declaration was signed by Mr. Arsen Darnay, Deputy Assistant Administrator of Solid Waste Programs, United States Environmental Protection Agency.

53. On October 7, 1974, the Pennsylvania Department of Environmental Resources, Division of Solid Waste Management, issued permit No. 100963 authorizing the Lycoming County Commissioners to proceed with the construction and operation of the project on the site at the Allenwood Federal Prison Camp. (Undisputed)

54. An appeal from said Department of Environmental Resources permit was filed with the Pennsylvania Environmental Hearing Board on or about November of 1974 (EHB Docket 74–246W), by Elizabeth Steward, Brady Township (Lycoming County), and Gregg Township (Union County), all plaintiffs in the instant case. (Undisputed)

55. The progress of the environmental review of the Pennsylvania Department of Environmental Resources Permit by the Pennsylvania Environmental Hearing Board was regularly reported by the local news publications in great detail.

56. The Pennsylvania Environmental Hearing Board took extensive testimony and reviewed the application to the Department of Environmental Resources.

57. All Plaintiffs were aware or should have been aware that the Pennsylvania Department of Environmental Resources permit was upheld by the Environmental Hearing Board on August 7, 1975 and by the Commonwealth Court of Pennsylvania on May 17, 1976. *Commonwealth of Pennsylvania, Dept. of Environmental Resources v. Steward,* 24 Pa.Cmwlth. 493, 357 A.2d 255 (1976), *allocatur* denied October 26, 1976.

58. Elizabeth Steward on or about September 10, 1976 stated to a newsman with reference to the application for allocatur to the Pennsylvania Supreme Court, "To be honest, this appeal is a delay tactic. Going to federal court could get very expensive, and we need time." (G67.)

59. Plaintiffs originally contemplated filing a suit in the United States District Court for the District of Columbia and this was one of the reasons advanced to Plaintiffs by their counsel for requiring substantial outlays of money.

60. In January, 1977, the commissioners of the townships involved committed themselves to advance $7,000 to Plaintiffs towards the prosecution of this suit.

61. In 1974, Lycoming County formally applied to the United States Environmental Protection Agency for a grant of funds for the proposed landfill project at the Allenwood Camp.

62. Under date of February 11, 1975, George W. Aderhold, Special Assistant to the Assistant Director of the Federal Bureau of Prisons, wrote to the Environmental Protection Agency's Office of Solid Waste Management Programs that he had no specific comments and agreed with the plan presented by Otte and the recommendations made therein.

63. The Lycoming County Solid Waste Facilities Complex is approached from the north by entering a deceleration lane constructed southbound on U.S. Route 15. (Undisputed)

64. The Environmental Hearing Board in its opinion dated August 7, 1975, dismissed the appeal and sustained the permit issued by the Department of Environmental Resources. (Undisputed)

65. Individual Plaintiffs are residents and citizens of Pennsylvania and the United States.

66. Defendant Griffin B. Bell is Attorney General of the United States.

67. Defendant Norman A. Carlson is Director of the United States Bureau of Prisons, Department of Justice.

68. Defendant Eldon Jensen is Superintendent of Allenwood Prison Camp, located in Brady Township, Lycoming County, Pennsylvania, which is the site of the landfill at issue.

69. Plaintiffs fear that the establishment of a regional municipal landfill will place in jeopardy their water supply for both human and livestock consumption and for business use by reason of leachate contamination of the ground water.

70. The Lycoming County Planning Commission made available to Plaintiff Organizations United for Ecology five copies of Lycoming County's Environmental Assessment at the time the Assessment was filed with the EPA.

71. The Commissioners of Lycoming County and the Commissioners of Loyalsock Township advised Plaintiffs in early 1977 that Plaintiffs would be held liable personally for damages incurred by the Commissioners of the county and said township if the federal grant for the landfill were lost as a result of Plaintiffs' activities.

72. Plaintiffs seek consideration of alternatives to the landfill disposal of solid waste, including resource recovery of materials or energy from solid waste.

73. Alternative solid waste landfill sites were investigated by Lycoming County throughout the County during the preparation of the Lycoming County Solid Waste Management Plan.

74. Plaintiffs decided to await the outcome of the appeal of the landfill permit in the state courts with the knowledge that they could have simultaneously pursued an action in Federal court under the National Environmental Policy Act.

75. Plaintiffs filed this action on August 10, 1977.

76. The Lycoming County Commissioners, in reliance upon the Federal Bureau of Prisons Permit, publicly advertised in November of 1976 for bids to purchase landfill equipment.

77. On December 21, 1976, the Lycoming County Commissioners publicly opened the bids for landfill equipment.

78. On December 28, 1976, the Lycoming County Commissioners publicly awarded contracts for said equipment at a cost of $382,875.00.

79. The Lycoming County Commissioners, in reliance upon the Federal Bureau of Prisons Permit, publicly advertised for bids in February, 1977 for the construction of the landfill on Allenwood Federal Prison Camp lands.

80. On April 7, 1977, the Lycoming County Commissioners publicly awarded contracts and became liable for the payment therefor in the amount of $2,068,-766.30.

81. The Lycoming County Commissioners, in reliance upon the Federal Bureau of Prisons Permit, publicly entered into a series of contracts in 1973, 1974, 1975 and 1976 for engineering and hydrogeological services, site evaluation, preparation of an application to the Pennsylvania Department of Environmental Resources, and final design and construction specifications costing a total of $302,103.29, as of April 19, 1977.

82. The Lycoming County Commissioners, in reliance upon the Federal Bureau of Prisons Permit, publicly sought and obtained financing and by ordinance publicly enacted on July 12, 1977, did commit the County to borrow $1,820,000.00, plus inter-

est in the amount of $782,912.00 for a 10 year period to help pay for the Allenwood landfill.

83. As of August 11, 1977, the Lycoming County Commissioners had actually paid or accrued costs due for work completed, on the landfill in the amount of $1,278,279.37.

84. The Lycoming County Commissioners, in reliance upon the Federal Bureau of Prisons Permit, contracted with the Pennsylvania Power and Light Company for a five-year period for the delivery of electrical service to said landfill site for a minimum charge of $41,236.00, plus a capital charge for the construction of three-phase service to the site in the amount of $10,849.00.

85. Between 55% and 70% of the initial physical project was completed prior to August 10, 1977.

86. Approximately 48% of the overall cost of the initial project was incurred for work done prior to August 10, 1977.

87. All Plaintiffs knew, or should have known, that the Lycoming County Commissioners were proceeding in 1973, 1974, 1975, and 1976 to contract for engineering and site evaluation and final design and construction specifications.

88. In 1977 the Lycoming County Commissioners did not intend to abandon or substantially change the design of the Allenwood landfill.

89. The filing of this lawsuit was not substantially delayed because of the possibility that the Plaintiffs would be liable to the Lycoming County Commissioners and Loyalsock Township.

90. The fact that the Lycoming County Landfill was under construction as of April 19, 1977 was known or should have been known by all of the Plaintiffs by reason of the numerous articles which were published in local newspapers.

91. The proposed Allenwood sanitary landfill will minimize the adverse environmental impact of existing dumps and landfill disposal practices in Lycoming County and four nearby counties, Union, Montour, Clinton, and Columbia, as well as the northern portion of Northumberland County.

92. The opening of the Allenwood sanitary landfill will allow the closing of most of the solid waste disposal facilities within Lycoming County and four nearby counties, Union, Montour, Clinton, and Columbia, as well as the northern portion of Northumberland County which pose a significant environmental problem.

93. There are at present no adequate alternative disposal sites with significant additional capacity for solid waste in Lycoming, Union, Montour, and Columbia Counties, as well as the northern portion of Northumberland County.

94. The opening of the Allenwood sanitary landfill will greatly curtail the open dumping of solid wastes which now poses a significant adverse environmental problem in Lycoming County.

95. Because of the severe limitations on existing solid waste disposal facilities in Lycoming County, the elimination of the Allenwood Landfill site would deprive Lycoming County of the only state-approved solid waste disposal site which is authorized to receive and capable of receiving all solid waste generated in Lycoming County.

96. If the Allenwood landfill does not commence operations within the near future the Commonwealth's program of planning and regulation for solid waste management in this general area will suffer a severe setback.

97. No alternative to Allenwood landfill can be put into operation in the near future.

### III. Discussion.

In 1969 the Federal Bureau of Prisons initiated planning to develop a sanitary landfill at Allenwood Prison Camp for the exclusive use of Allenwood Prison Camp and the Federal Penitentiary at Lewisburg, Pennsylvania. On March 27, 1972, a meeting was held in the Office of the Bureau of Prisons Supervising Architect, George W. Aderhold, attended by representatives of SEDA, of the Leonard S. Wegman & Co., Inc., consulting engineer for SEDA, and of

the Pennsylvania Department of Environmental Resources at which the Bureau of Prisons advised that Allenwood Camp lands would be made available for a landfill if the Bureau Director approved the permit subject to appropriate environmental review and approval by relevant federal and state agencies. On March 29, 1972, SEDA wrote to the Bureau of Prisons stating that the envisioned landfill at Allenwood would be used as a deposit site for municipal solid waste generated by at least 250,000 people of the north central Pennsylvania region's population. The Lycoming County Commissioners because of obligations incurred pursuant to the Pennsylvania Solid Waste and Management Act of 1968, Act of July 31, 1968, P.L. 788, No. 241 § 1, 35 P.S. 6001 et seq. entered into an arrangement with the Federal Bureau of Prisons on June 5, 1973 by which the Commissioners would be permitted to use approximately 130 acres of land at the Allenwood Prison Farm for a landfill which would serve a 5½ county area.

Plaintiffs knew or should have known during 1973 that the Federal Bureau of Prisons had actually granted a permit to the Lycoming County Commissioners to use a site at Allenwood Prison Camp for a sanitary landfill for solid waste. The Organizations United for Ecology which was formed in 1974, was aware at its second meeting on June 4, 1974 that the Bureau of Prisons had issued a permit for the landfill to the Lycoming County Commissioners. All of the Plaintiffs knew or should have known as early as August, 1974 of the contention that the Federal Bureau of Prisons had not complied with the National Environmental Policy Act, 42 U.S.C.A. § 4331, et seq. As of the date of this Opinion, the Bureau of Prisons has not prepared an Environmental Impact Statement. The Plaintiffs contend that such an impact statement is required by the National Environmental Policy Act.

On April 4, 1975, the Environmental Protection Agency which had agreed to be the lead agency for the purpose of any required Environmental Impact Statement issued a negative declaration of environmental impact, accompanied by an appraisal 95 pages long and containing 23 exhibits. On October 7, 1974, the Pennsylvania Department of Environmental Resources issued a permit authorizing the Lycoming County Commissioners to proceed with the construction and operation of the landfill at the Allenwood Federal Prison Camp. An appeal from this permit was filed with the Pennsylvania Environmental Hearing Board on or about November of 1974 by Elizabeth Steward, Brady Township (Lycoming County) and Gregg Township (Union County), all Plaintiffs in the above-captioned action. The Environmental Hearing Board affirmed the grant of the permit on August 7, 1975 and its action was approved by the Commonwealth Court of Pennsylvania on May 17, 1976. *The Commonwealth of Pennsylvania, Department of Environmental Resources v. Steward,* 24 Pa.Cmwlth. 493, 357 A.2d 255 (1976). The Supreme Court of Pennsylvania denied allocatur on October 26, 1976.

On December 28, 1976, the Lycoming County Commissioners publicly awarded contracts for equipment for the landfill at a cost of $382,875.00. On April 7, 1977 the Commissioners awarded contracts for the landfill and became liable for payment in the amount of $2,068,766.30 in connection therewith. On July 12, 1977, the Lycoming County Commissioners committed the County to borrowing $1,820,000 plus interest in the amount of $782,912.00 for a ten-year period to help finance the landfill. As of August 11, 1977, the Lycoming County Commissioners had actually paid or accrued costs due for work completed at the landfill in an amount totalling $1,278,279.37. Approximately 48% of the overall cost of the initial project was incurred for work done prior to August 10, 1977. Between 55% and 70% of the initial physical project was completed prior to August 10, 1977. Construction on the landfill began on April 19, 1977 and this was known or should have been known by all the Plaintiffs because of numerous articles published in local newspapers.

This suit was filed on August 10, 1977. The Defendants contend that the

Plaintiffs' cause of action is barred by laches. Because laches is an affirmative defense, the burden of proof is on the Defendants. The laches defense applies to complaints submitted pursuant to the National Environmental Policy Act, 42 U.S.C.A. §§ 4331 et seq. *Save Our Wetlands v. U. S. Army Corps of Engineers*, 549 F.2d 1021, 1026 (5th Cir. 1977); *Shiffler v. Schlesinger*, 548 F.2d 96, 103 (3d Cir. 1977). Those courts which have held that laches does not preclude a cause of action pursuant to NEPA have also based their conclusion on failure to meet one of the requirements of laches. In *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975), the Court expressed the view that laches should not bar a NEPA action but also found that there had not been a lack of diligence in bringing the suit. In *I–291 Why? Association v. Burns*, 517 F.2d 1077 (2d Cir. 1975), the Court, although stating that laches should not bar a NEPA action also refused to utilize the laches defense because it found the absence of a showing of great progress during the alleged delay in bringing suit.

■ The Defendants must meet three independent criteria before the equitable doctrine of laches can be applied. First, the Defendants must show a delay by the Plaintiffs in asserting a claim. Second, they must establish that the delay was not excusable. Third, they must show that there is undue prejudice to the party against whom the claim was asserted. *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975); *Shiffler v. Schlesinger*, 548 F.2d 96, 103 (3d Cir. 1977).

■ Although inexcusable delay is to be considered in applying laches to a NEPA suit, it lacks its usual importance as a factor. The reason for this is that the Plaintiffs are allegedly seeking to enforce congressional policies protecting the public generally rather than any particular individual. Thus, the public at large will usually bear the burden when a meritorious environmental challenge is precluded because of laches. In addition, Federal agencies have a responsibility to comply with NEPA. When they fail in that responsibility, they

are in a somewhat weakened position to contend that tardiness should bar relief. *Shiffler v. Schlesinger, supra.* In determining prejudice in a suit to enforce NEPA, the central consideration is whether enjoining the governmental project would severely prejudice the public interest which the agency action is supposed to be serving. Delay and resultant cost increase alone do not justify non-compliance with NEPA. *Shiffler v. Schlesinger, supra.* But these factors should be considered. In *Shiffler*, the Court did take into consideration the extent to which the project had been completed and the cost to the Government of enjoining the project. *See City of Rochester v. United States Postal Service*, 541 F.2d 967 (2d Cir. 1976); *Save Our Wetlands v. U. S. Army Corps of Engineers*, 549 F.2d 1021, 1028 (5th Cir. 1977).

■ The Plaintiffs have clearly delayed in bringing this action. By August 26, 1974, the Plaintiffs had been advised by their attorney, John C. Sullivan, that it would be necessary to file suit in federal court to deter further steps to construct the landfill at the prison camp. By that time they knew that the Federal Bureau of Prisons had not prepared an EIS. The Court is expressing no view as to whether an impact statement was required by NEPA. In fact, a motion to accept Sullivan's advice was carried at the OUE meeting on August 26, 1974 and was never rescinded. The Plaintiffs knew or should have known in 1973 that a permit had been issued for the construction of the Allenwood landfill. Although Mr. Otte, an official of the Environmental Protection Agency asked Mrs. Steward, the Plaintiff in this case and Chairman of OUE, at the Pennsylvania Environmental Hearing Board to comment about the environmental impact of the landfill she declined to do so. On November 1, 1974, Otte wrote to Dorothy Corson, the Secretary of OUE, requesting the Organization's comments on any possible environmental impact of the proposed sanitary landfill. The letter of Otte was read at an open meeting of OUE on November 12, 1974. (G 94). As a result of advice from OUE's

counsel, the EPA never received any response to its November 1 letter. By the time OUE and the other Plaintiffs in this case had filed this suit on August 10, 1977, the landfill was 55% to 70% completed.

The Court must now determine whether the Plaintiffs' delay was inexcusable. The Court believes that there is no justification for bringing this lawsuit nearly three years after counsel for OUE, John C. Sullivan, advised the members of OUE that such action was necessary. Plaintiffs in this action who were members of OUE at the time should have known of Sullivan's advice. Even if they did not, they knew or should have known certainly by August of 1974 that the Bureau of Prisons had not prepared an Environmental Impact Statement although over a year had passed since a permit had been issued allowing the construction of the landfill, subject to approval by the appropriate state and federal environmental agencies.

The Plaintiffs present several explanations for their failure to file suit before August 10, 1977. First, they contend that they were challenging the granting of a permit for the landfill by the Pennsylvania Department of Environmental Resources before the Pennsylvania Environmental Hearing Board, the Commonwealth Court, and the Supreme Court of Pennsylvania and that these actions were not completed until the Pennsylvania Supreme Court refused to grant *allocatur* on October 26, 1976. Delay in asserting an equitable remedy because the Plaintiff has made a bona fide effort to assert a claim at law, the failure of which establishes the right to pursue an equitable remedy does not constitute laches. *Hoehn v. Crews*, 144 F.2d 665 (10th Cir. 1944), cert. denied, 323 U.S. 773, 65 S.Ct. 132, 89 L.Ed. 618 (1944). In addition, if the former suit had a similar object but proved unavailing, laches does not bar the second suit. *Hoehn v. Crews, supra.* This principle is not applicable to the Plaintiffs in this case. At all times after the issuance of a permit and certainly in August, 1974, they had the right to file a NEPA suit in federal court. Counsel for

the Plaintiffs contends that the federal court might have refused to hear the complaint because of the available state remedies. An action to enforce NEPA is independent of any state legal procedure. The Plaintiffs had legal counsel and knew or should have known this. A tactical decision was made by the Plaintiffs to challenge the issuance of a permit for the landfill by the Commonwealth of Pennsylvania's Department of Environmental Resources instead of filing an action in federal court pursuant to NEPA challenging the failure of the Bureau of Prisons to prepare an EIS.

These are two different remedies. NEPA merely requires that a federal agency be involved in a major federal action significantly affecting the environment and take into consideration the following factors:

(1) The environmental impact of the proposed action;

(2) Any adverse environmental effects which cannot be avoided should the proposal be implemented;

(3) Alternatives to the proposed action;

(4) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(5) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C.A. § 4331. The purpose of this statute is to insure that the environmental effect of federal action be taken into account and that a balance be made between the benefits of the proposed action and its adverse environmental consequences, if any. The granting of a permit by the Department of Environmental Resources depends upon a different set of criteria, basically, whether or not the landfill actually would cause damage to the environment. The Plaintiffs contend that if they had prevailed in their action in the state courts or before the Environmental Hearing Board, it would not have been necessary to file a complaint in federal court pursuant to NEPA. But the reverse of

that argument is true. If an Environmental Impact Statement had to be prepared, preparation of such a statement at an earlier stage in the landfill project might have caused the Bureau of Prisons and the Environmental Protection Agency to reevaluate the landfill project and no state court action would have been necessary. The Plaintiffs must bear the consequences of their tactical choice of forum. They could have and perhaps should have pursued the action before the Environmental Hearing Board and the state courts and the federal NEPA action simultaneously. Litigants who have dual claims both under Pennsylvania law and federal law commonly file complaints in both state and federal courts to protect their interests. The Court is of the view that after the Commonwealth Court denied Mrs. Steward's challenge to the permit issued by DER for the landfill on May 17, 1976 the application for *allocatur* to the Pennsylvania Supreme Court was taken for the purpose of delay to permit time to raise money for the federal court action. On or about September 10, 1976, Mrs. Steward told a newsman with reference to the application for *allocatur* to the Pennsylvania Supreme Court the following: "To be honest, this appeal is a delay tactic. Going into federal court can get very expensive and we need time." (Government Exhibit 67). It is these delaying tactics that the doctrine of laches is designed to prevent. In the light of the foregoing, the Court concludes that the utilization of state administrative and state court remedies to challenge the grant of the permit by DER does not justify the delay in bringing this action in federal court pursuant to NEPA.

 Second, the Plaintiffs maintain that they did not possess the financial ability to bring this lawsuit in federal court before August 10, 1977. A Plaintiff cannot justify his lack of diligence in prosecuting litigation simply by declaring that he is poor. If lack of funds creates a barrier to litigation in particular cases, the Court in applying the equitable doctrine of laches must take this into account and determine if the evidence reveals diligence on Plaintiff's part in attempting to overcome the barrier. If the Plaintiff has been diligent, then he has not slept on his rights and laches does not bar his cause of action. *Powell v. Zuckert*, 125 U.S.App.D.C. 55, 366 F.2d 634 (1966). The Plaintiffs in this case have not met this standard. They knew as early as August 28, 1974 that in order to ensure compliance with their view of what NEPA mandated, federal court action would be necessary. Fund raising could have begun then. In addition, in January, 1977, several townships pledged $7,000.00 for federal court action. The Plaintiffs had earlier been told by their counsel John C. Sullivan that federal court action would require $18,000.00 in advance, not for his fees but because he was contemplating suing in the federal district court for the District of Columbia. Counsel in the District of Columbia would have to be retained and other expenses related to filing the complaint in the District of Columbia would be incurred. The Plaintiffs in presenting their testimony have not shown that such costs would have been required for filing a suit in the Middle District of Pennsylvania. If they did not possess the financial means to engage in litigation in the District of Columbia, the Plaintiffs should have filed the suit in the Middle District of Pennsylvania substantially before August 10, 1977. Certainly a delay of three years cannot be justified by the Plaintiffs' desire to have their cause of action litigated in the District of Columbia. The Plaintiffs have not shown and the Court is not aware of any right to pursue their cause of action in the District of Columbia. Certainly a Plaintiff has the opportunity to choose his forum as long as it complies with the requirements of venue and jurisdiction. But he cannot justify delay when a more convenient forum is available by his desire to pursue his action in the forum of his choice. Plaintiffs have not established that they were financially unable to pursue this litigation at a date substantially earlier than August, 1977. Certainly, by January, 1977, they possessed the means to initiate this action. In the light of the foregoing, the Court concludes that the Plaintiffs' claim that they lacked

financial resources does not excuse the delay in filing this complaint.

Third, the Plaintiffs contend that the delay in bringing their action was reasonable because they were entitled to assume that the Bureau of Prisons would comply with the requirements of NEPA. Ordinarily, Plaintiffs are entitled to rely upon the obligation of a federal agency to obey the dictates of NEPA. *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164 (6th Cir. 1972); *Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975). But this reliance becomes unreasonable when the Plaintiffs become aware or should become aware of the fact that the agency is not going to comply with the requirements of the Act as the Plaintiffs view them. In this case by August, 1974 counsel for OUE had advised the Bureau of Prisons as to the Organization's view that NEPA required an Environmental Impact Statement before the permit of June 5, 1973 should have been issued. The Bureau of Prisons took no action. Consequently, as of August, 1974, it was unreasonable for the Plaintiffs to assume that an Environmental Impact Statement would be prepared by the Bureau of Prisons. Consequently, the Plaintiffs' view that the obligation of the Bureau of Prisons to prepare an Environmental Impact Statement excuses their delay in bringing their action is rejected by the Court.

Fourth, the Plaintiffs maintain that their delay in bringing this suit was reasonable because they attempted to convince the Lycoming County Commissioners to modify their plan for a landfill at Allenwood during 1977. Various members of OUE had been trying without success since the Bureau of Prisons had issued the permit on June 5, 1973 to convince the County Commissioners either to forego a sanitary landfill at Allenwood or to make certain changes in that landfill. Certainly there must come a point where individuals and organizations who have a cause of action cannot continue to negotiate when there is not a reasonable chance of success. No evidence has been presented to this Court to indicate that the Plaintiffs' contention of violations of NEPA were going to be alleviated by the County Commissioners in 1977. The County Commissioners in 1977 never considered abandoning the landfill or substantially changing its design or function. Consequently, the Court concludes that efforts by the Plaintiffs in this case to compromise with the County Commissioners in 1977 do not constitute an excuse for delaying the filing of this suit until August 10, 1977.

Fifth, the Plaintiffs argue that because the Commissioners of Lycoming County and officials of Loyalsock Township advised the Plaintiffs in early 1977 that the Plaintiffs would be sued personally for damages incurred by the County and the Township if the federal grant which was to be received from EPA were lost as a result of their filing of a NEPA suit, the delay in the filing of their action is excusable. Such representations do not explain why the Plaintiffs had not brought suit before early 1977. In addition, the Plaintiffs have not shown that it was because of the possibility of being held personally liable that they delayed until August, 1977. At most, the possibility of personal liability for damages would cause the Plaintiffs to consult legal counsel. There is no indication that preparation of this suit was suspended for any substantial time period as a result of the possibility of personal liability. Although Elizabeth Steward testified that the possibility of personal liability delayed the suit, she did not set forth how it did so or for how long. While certain individuals who planned to be Plaintiffs in this action withdrew from this suit as a result of the possibility of personal liability, there is no evidence that this caused any delay in the pursuit of this action. In the light of the foregoing, the Court concludes that the Plaintiffs' contention that the possibility of their personal liability to Loyalsock Township and Lycoming County was an excusable ground for delay in filing this suit is without merit.

Sixth, the Plaintiffs argue that the late intervention of the Lycoming County Com-

missioners and DER should bar them from asserting the equitable doctrine of laches because they do not have clean hands. The last minute intervention in this case of DER and the Lycoming County Commissioners is certainly reprehensible and could have caused considerable difficulty. But the reason DER and the Lycoming County Commissioners filed motions for intervention is because they were not named as parties by the Plaintiffs. Since the Court believes that DER and the Lycoming County Commissioners have strong interests in this lawsuit it concludes that the Plaintiffs should not be able to benefit from failing to name them as Defendants. Barring the Lycoming County Commissioners and DER from asserting the defense of laches because of the lateness of the intervention when the Court has allowed them to intervene would undercut the policy considerations implicit in F.R.Civ.P. 24(a) mandating intervention in certain cases. The Court has concluded that both DER and the Lycoming County Commissioners met the appropriate standard. (See Order of October 31, 1977 and Order of November 9, 1977). The Plaintiffs have not shown any prejudice by allowing DER and the Lycoming County Commissioners to raise the defense of laches. The Bureau of Prisons had previously pled this defense in its answer and would have been permitted by this Court to put forth evidence of injury to the public as part of its defense of laches. In the light of the foregoing, the Court will deny the Plaintiffs' claim that the Lycoming County Commissioners and DER should be barred from asserting the defense of laches.

■ Seventh, the Plaintiffs contend that the Lycoming County Commissioners, the Bureau of Prisons and the Department of Environmental Resources should have brought an action for declaratory judgment in early 1977 to determine if in fact NEPA had been violated and thus remove any doubt before proceeding with construction of the landfill. The burden is not on the Defendants to anticipate possible litigation from the Plaintiffs. Such a requirement would flood the Courts with lawsuits posing hypothetical issues and greatly add to the cost of public administration with little or no resulting benefit. In addition, the Court believes that such a suit would have been dismissed because of lack of standing and the absence of a case or controversy as required by Article III of the United States Constitution. *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Consequently, the Court rejects the claim of the Plaintiffs that the Defendants had an obligation to file a declaratory judgment to determine if they were in violation of NEPA.

■ Eighth, the Plaintiffs contend that because between August, 1974 and August 10, 1977, they had on many occasions publicly stated their intention of bringing a lawsuit pursuant to NEPA it was not untimely delay to bring the suit on August 10, 1977. The Court finds this explanation unconvincing. It is precisely because the Plaintiffs repeatedly stated that they were going to bring the lawsuit that the County Commissioners, the Bureau of Prisons and the Department of Environmental Resources were justified in disregarding those expressed intentions when for over a period of almost three years they did not materialize. A mere threat to bring suit cannot act to prevent the running of laches, because the prospective defendants have no way of knowing whether or not an action ever will be brought. The County Commissioners by April, 1977 had been hearing about the threat of litigation pursuant to NEPA for many years. Certainly they had no obligation to wait to pursue the project until such time as the Plaintiffs would bring suit, because they had no way of knowing when that would be. In the light of the foregoing, the Court concludes that Plaintiffs' contention that their public statements of intent to bring suit pursuant to NEPA excuses their delay in the filing of the suit is without merit.

After considering the explanations set forth by the Plaintiffs, the Court concludes that the Defendants have met their burden of proof and have established that the Plaintiffs engaged in inexcusable delay in failing to bring this action before August 10, 1977.

The Court must now examine the prejudice, if any, which would result to the Defendants and to the public if the landfill project is enjoined. The Court finds this case very different from most other situations involving failure to comply with NEPA. This is one of the few projects challenged whose purpose is to effectuate the environmental concerns which are the basis of NEPA. The solid waste landfill at the Allenwood Prison Camp is designed to handle solid waste for 5½ counties, Lycoming County, Clinton County, Union County, Columbia County, Montour County, and the northern portion of Northumberland County. These 5½ counties face a severe solid waste crisis. Dumping facilities in these counties are inadequate and in many cases cause considerable pollution to the environment. DER has permitted several dumping grounds and landfills to continue in existence pending the opening of the landfill at Allenwood. Failure to open that landfill will necessitate allowing many dumping areas in the aforementioned 5½ counties jeopardizing the environment to continue in operation. Several of these dumping areas are on the verge of being saturated. Failure to open the Allenwood landfill as soon as possible will mean that these 5½ counties will be hard put to dispose of their solid waste. In Lycoming County open dumping of solid wastes is prevalent. DER has been hesitant to curtail such practices because of the lack of suitable alternatives. The people of the 5½ counties involved have a right to be free from fear of pollution and to have adequate disposal facilities available as soon as possible. No readily available alternative to the Allenwood sanitary landfill site can be put into operation in the near future. The Lycoming County Commissioners, DER, and the Counties of Union, Montour, Clinton, Columbia, and Northumberland have committed themselves to this landfill project and are depending upon it to relieve what can be justifiably termed a solid waste crisis in this part of the Commonwealth. This Court has heard detailed testimony concerning the danger to the environment posed by many existing dumping sites in the 5½ counties which will utilize the Allenwood landfill. The Court must balance the harm to the public that will result by preventing the opening of the Allenwood landfill against the harm to the Plaintiffs and the public which will result from opening the landfill. The Plaintiffs contend that the landfill would jeopardize the water supply of the residents and their livestock in the surrounding area and that it will mar the natural and human environment of Brady Township and the surrounding Townships of Gregg, Clinton, and Washington. The Court concludes that, even if this is true, the damage that the public will suffer as a result of a delay in the opening of the Allenwood landfill outweighs any damage that the public and the Plaintiffs will suffer from opening the landfill. In addition, because the project was 55% to 70% complete as of August 10, 1977, much of the physical damage to the scenery has already occurred and cannot be prevented by an environmental impact statement.

Although the primary concern of the Court in determining whether laches should bar a suit pursuant to NEPA is the environmental effects of the project or failure to pursue the project, the Court can consider whether construction may have gone so far that for economic reasons it would be impractical or impossible to alter much of the basic plan. *Steubing v. Brinegar,* 511 F.2d 489, 495 (2d Cir. 1975); *City of Rochester v. United States Postal Service,* 541 F.2d 967, 977 (2d Cir. 1976). In addition, the Court can determine whether the project has been so substantially completed that there is little likelihood an EIS will result in any major changes or environmental benefits. *Save Our Wetlands v. U. S. Army Corps of Engineers,* 549 F.2d 1021, 1028 (5th Cir. 1977).

On December 28, 1976, the Lycoming County Commissioners publicly awarded contracts for the landfill equipment at a cost of $382,875.00. On April 7, 1977, the Commissioners publicly awarded construction contracts and became liable for payment in the amount of $2,068,766.30. As of April 19, 1977, the Commissioners had entered into a series of contracts for engineering, hydrogeological services, site evalua-

tion, preparation of an application to the Pennsylvania DER and final design and construction specifications, costing a total of $302,103.29. On July 12, 1977, the Lycoming County Commissioners committed the County to borrow $1,820,000 plus interest in the amount of $782,912.00 to help to finance the landfill. As of August 11, 1977, the Lycoming County Commissioners had actually paid or accrued costs due for work completed of $1,278,279.37. The Lycoming County Commissioners contracted with the Pennsylvania Power & Light Company for a five-year period for delivery of electrical services to the landfill site for a minimum charge of $41,236.00 plus a capital charge for the construction of 3-phase service to the site in the amount of $10,849.00. Approximately 48% of the overall costs of the initial project was incurred for work done prior to August 10, 1977. Because of the extent of the construction which has taken place, the money expended, and the lack of an alternative disposal site it is extremely doubtful that any EIS would result in significant modifications of the project. Although the federal government would prepare the statement, certainly it would take into consideration the lack of alternative sanitary facilities for solid waste in this 5½ county region and the amount of money already spent by the Lycoming County Commissioners. In addition, the EPA in April, 1975 approved an Environmental Impact Appraisal in which it concluded that the landfill project would have no significant adverse effect on the environment. The appraisal considered the factors mandated by NEPA. It is highly unlikely that an EIS prepared by EPA or the Bureau of Prisons would lead to a different conclusion.

Several courts facing similar factual situations to that presented by this case have concluded that laches barred suits brought pursuant to NEPA. In *Iowa Student Public Interest Research Group v. Callaway,* 379 F.Supp. 714, 719 (S.D.Iowa, 1974), the Court held that where a project was ⅔ complete and halting it would involve immense expense to the Defendants and the public, a complaint pursuant to NEPA was barred by laches. In *Centerview/Glen Avalon Homeowners Association v. Brinegar,* 367 F.Supp. 633 (C.D.Cal.1973), the Plaintiffs waited for 3 years to file an action pursuant to NEPA to require an EIS before a highway was built. The Defendants had already started construction of the highway and their activities involved substantial expenditures of public funds. The Court stated that the provisions to be enforced pursuant to NEPA are procedural in nature and if enforced would not necessarily result in any change in the freeway project other than delay and concluded that the suit was barred by laches. In *National Association of Government Employees v. Rumsfeld,* 418 F.Supp. 1302, 1305 (E.D.Pa. 1976), the Plaintiffs contended that an Environmental Impact Statement had to be prepared before the closing of an army arsenal could take place. The closing of the arsenal was announced on November 22, 1974. The Plaintiffs did not file their action until May 6, 1976. Defendants spent money and made plans to restructure the entire armaments community of the United States on the assumption that the decision to close the arsenal was valid. The Court concluded that the suit pursuant to NEPA was barred by laches. In *Smith v. Schlesinger,* 371 F.Supp. 559 (C.D.Cal.1974), the Plaintiffs filed suit pursuant to NEPA 7½ months after the Navy announced the project and when the project was 35% to 40% complete. The Court held that this action was barred by laches. *See City of Rochester v. United States Postal Service,* 541 F.2d 967, 977 (2d Cir. 1976); *Friends of Yosemite v. Frizzell,* 420 F.Supp. 390, 397–398 (N.D.Cal.1976); *Save Our Wetlands v. U. S. Army Corps of Engineers,* 549 F.2d 1021, 1028 (5th Cir. 1977). The above cited cases did not involve a project which would relieve harm to the environment as is the case with the landfill. The delay in many of the cases discussed above was not as egregious as that which occurred in this case. Because of the inexcusable delay of the Plaintiffs in bringing this suit, the prejudice which would result to the public, and the improbability that an EIS at this late date would result in any substantial change in the project, and the financial burden which has been incurred by Lycoming

County, the Court concludes that the Plaintiffs' suit is barred by laches.

The Plaintiffs and the Defendants filed motions for summary judgment accompanied by hundreds of pages of documents on the eve of the trial of this case. Because of the inexcusable late filing of the motions and because there were material facts in dispute the Court will deny the motions. The Defendants' motion to strike Plaintiffs' supplemental list of prospective witnesses is denied because those witnesses never testified.

### IV. Conclusions of Law.

1. The Plaintiffs' pursuit of state administrative and state court actions does not excuse their failure to file a timely complaint in federal court pursuant to NEPA.

2. The possibility of personal liability on the part of the Plaintiffs to the Lycoming County Commissioners and Loyalsock Township does not excuse the delay in the filing of the Plaintiffs' complaint.

3. The Lycoming County Commissioners, DER, and the Bureau of Prisons, and the other Defendants in this action had no responsibility to file an action for a declaratory judgment to determine if their actions had violated NEPA.

4. The late intervention of the DER and the Lycoming County Commissioners as Defendants to this action does not bar them from raising the defense of laches to the Plaintiffs' complaint.

5. The Plaintiffs' attempt to convince the Lycoming County Commissioners to modify or abandon the landfill project at Allenwood Prison Camp does not excuse their delay in filing this complaint.

6. The Plaintiffs' reliance on the Bureau of Prisons' obligation to conform to the requirements of NEPA does not excuse the delay of the Plaintiffs in filing this complaint.

7. The fact that the Plaintiffs stated that on many occasions between August, 1974 and August, 1977 they intended to file a complaint pursuant to NEPA does not excuse their delay in filing that complaint.

8. The alleged financial condition of the Plaintiffs does not excuse their delay in bringing this lawsuit.

9. The Plaintiffs' delay in filing their complaint pursuant to NEPA was inexcusable.

10. The prejudice to the public interest arising out of a delay in opening the Allenwood landfill outweighs any prejudice to the public interest and to the Plaintiffs which will occur from the operation of the landfill.

11. It is unlikely that an EIS would result in any substantial change in the landfill project at Allenwood.

12. If the landfill project is delayed, the Lycoming County Commissioners, and Lycoming County residents, and residents of nearby counties will be severely prejudiced.

13. The Plaintiffs are barred by laches from bringing this lawsuit.

An appropriate order will be entered.