SAVE OUR WETLANDS, INC. (SOWL), et al., Plaintiffs-Appellants,

v.

UNITED STATES ARMY CORPS OF ENGINEERS et al., Defendants-Appellees.

No. 75–1750.

United States Court of Appeals, Fifth Circuit.

April 4, 1977.

Rehearing and Rehearing En Banc Denied May 16, 1977.

---

Plauche F. Villere, Jr., Luke Fontana, New Orleans, La., for plaintiffs-appellants.

Gerald J. Gallinghouse, U. S. Atty., John R. Schupp, Asst. U. S. Atty., New Orleans, La., Patrick J. Berrigan, Asst. Dist. Atty., Slidell, La., for St. Tammany Parish.

Stephen A. Duczer, Ralph L. Kaskell, Jr., Slidell, La., Harry S. Anderson, Charles K. Reasonover, New Orleans, La., for Leisure, Inc.

Wallace H. Johnson, Asst. Atty. Gen., George R. Hyde, Robert L. Klarquist, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before BROWN, Chief Judge, and HILL and FAY, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The plaintiffs in this environmental case are appealing from an order and judgment dismissing their complaint on the ground that it is barred by laches. Save Our Wetlands, Inc. ("SOWL"), a Louisiana non-profit corporation, and Francois Jelalian, a private individual, brought this action for declaratory and injunctive relief on October 29, 1974, naming as defendants 37 individuals, corporations and governmental agencies. The federal defendants named were the United States Army Corps of Engineers, the Environmental Protection Agency, and the Department of Housing and Urban Development, together with various officers of these agencies. The non-federal defendants included Leisure, Inc. ("Leisure") and Bradley-McDonald Corporation ("Bradley-McDonald"), the developers of two real estate projects known, respectively, as Eden Isles and Mariner's Village.

The plaintiffs alleged in their complaint that the two real estate developments, located on the north shore of Lake Pontchartrain, were causing serious adverse effects on the environment. The complaint contended that lakes Maurepas, Pontchartrain, Catherine and Borgne, all located in Southern Louisiána, comprised a single ecological unit, referred to as the MPCB estuary, and that this ecosystem was on the verge of "collapse" due to the allegedly indiscriminate development of the Mariner's Village and Eden Isles projects. The plaintiffs' principal allegation concerned the validity of certain permits issued to Leisure and Bradley-McDonald by the United States Army Corps of Engineers ("the Corps"). The plaintiffs alleged that the Corps had violated the National Environmental Policy Act, 83 Stat. 852, 42 U.S.C. § 4321 et seq., and various other federal statutes, by issuing the permits pursuant to Section 10 of the Rivers and Harbors Appropriation Act of 1899 ("Rivers and Harbors Act"), 30 Stat. 1151, 33 U.S.C. § 408. The plaintiffs urged the district court to order an immediate regional cumulative study of the MPCB estuary and to impose a 30-month moratorium on the issuance of further Corps of Engineers permits in the MPCB area.

Two days after the complaint was filed, the district court entered an ex parte order temporarily restraining Leisure from conducting pumping and dredging operations adjacent to Lake Pontchartrain. The order was to take effect when plaintiff SOWL posted security of $5,000, but SOWL failed to do so and the order never became effective.

Thereafter, upon stipulation of the parties, the district court referred the suit for trial before a Magistrate sitting as Special Master, pursuant to Rule 53, F.R.Civ.P. Upon agreement of counsel, the Special Master determined to try the issues of standing, laches and preliminary injunctive relief prior to the trial of the other issues.[1]

On December 20, 1974, the Special Master entered his first Report, which included a recommendation that SOWL's motion for preliminary injunction be denied.[2] On Jan-

1. Trial was held before the Special Master on November 14, 15, 16, 17, 21, 22, 25, 26, 1974, and January 3, 1975.

2. The Special Master's Report also dismissed certain plaintiffs for lack of standing. The plaintiffs SOWL and Jelalian attempted in their complaint to include as additional plaintiffs various species of wildlife allegedly being destroyed by defendants. For example, the complaint named, among others, rangia cuneata

uary 10, 1975, the Special Master submitted a Supplemental Report containing further findings of fact and conclusions of law and recommending that the complaint be dismissed as barred by laches.

The district court, believing that the time for filing objections had expired, entered a judgment order on January 28, 1975, adopting the Special Master's Report and Supplemental Report and dismissing the action on the basis of laches. Subsequently, upon ascertaining that the objections and motion for a new trial had been timely filed, the district court suspended its previous order and on February 20, 1975, held a hearing on the objections and motion for new trial. Finally, on February 28, 1975, the trial judge entered an order overruling the objections to the Special Master's Reports, denying a new trial and reinstating its previous order of January 17, 1975. This appeal followed.

By order dated September 24, 1975, this Court restricted the issues on appeal to the issue of laches. The appellants have also limited this appeal in terms of the parties to whom it applies. Although the defense of laches was found by the district court to be available to the developers of both Mariner's Village (Bradley-McDonald Corporation) and Eden Isles (Leisure, Inc.), the plaintiffs have not appealed that portion of the district court's judgment pertaining to the Mariner's Village Development. This opinion, therefore, discusses only the facts and issues applicable to the Eden Isles development.

## I. The Facts.

Eden Isles is a real estate development consisting of approximately 5,300 acres located on the northern shores of Lake Pontchartrain and bisected into two parcels known as Eden Isles East (2,300 acres) and Eden Isles West (3,000 acres). In approximately 1927, the area known as Eden Isles was enclosed with dikes and levees, drained and used for agricultural purposes. These improvements were undertaken pursuant to the authority of the St. Tammany Police Jury, the local governing body responsible for creating drainage districts to be used in the reclaiming of marsh lands. The property on which Eden Isles is located lies within the area known as St. Tammany Parish Drainage District No. 2.[3] Following construction of the improvements by the Drainage District, the area was maintained as dry land until the 1930's when, as a result of the economic depression, the Drainage District became inactive and its facilities and levees suffered deterioration. During this period, the area again flooded.

In 1962, the St. Tammany Parish Police Jury became the governing body of the District and began rehabilitation of the project. Between 1962 and 1966, the Police Jury issued almost $2,000,000 in bonds to finance works to redrain the area and renovate the levees, canals and pumping station. Renovation was completed by 1966 and, except for a brief period in 1974,[4] Eden Isles has been dry land ever since that time. There is no indication in the record that the Police Jury ever applied for or obtained any permit from the Corps of Engineers for any of the installations on Drainage District No. 2.

In January, 1969, Leisure acquired the 5,300 acres known as Eden Isles East and Eden Isles West. From that time until the trial of this case, Leisure spent over $26,-000,000 to develop the project.[5] The developments on Eden Isles West include a pe-

(clam), cynoscion nebulosus (speckled trout), the Southern bald eagle and the American alligator. In his December 20, 1974, report, the Special Master dismissed for lack of standing all of the species of wildlife named as plaintiffs.

3. The District was created in 1925 under Louisiana law by an ordinance of the St. Tammany Police Jury, which appointed a Board of Commissioners to supervise the District.

4. After Hurricane Carmen, in September, 1974, there was a break in the levee which, until it was repaired after three or four weeks, caused flooding in Eden Isles East.

5. These expenditures included the costs of land acquisition, engineering, land fill, sewers, sewer treatment facilities, pumping stations, water facilities, streets, bulkheads, bridges, maintenance and advertising.

rimeter and interior canal system, construction of which was begun in 1969 and completed in March, 1973. During this period, development of Eden Isles was progressing virtually every day and, from 1970 to 1973, work was carried on 24 hours a day. Not only has Leisure expended large sums of money on Eden Isles over a period of several years, the development has been a highly visible project since its inception.[6] Moreover, the project has been highly publicized by Leisure since January or February of 1970. Beginning at that time and continuing through September, 1974, Leisure spent over $850,000 to advertise the project in the New Orleans Metropolitan area, using various media, including newspapers, television, radio, brochures, pamphlets, magazines and billboards.

The canal system of Eden Isles West is so constructed that craft departing from the canals pass into a basin known as Grand Lagoon from which they then pass through a channel into Lake Pontchartrain. In October, 1971, Leisure submitted to the Corps an application for a permit under Section 10 of the Rivers and Harbors Act, seeking permission to dredge an entrance channel from Lake Pontchartrain to Grand Lagoon. The Corps thereafter requested that Leisure submit a revised application covering not only the entrance channel, but also the interior canal system and the connecting channel to Lake Pontchartrain. Leisure complied with this request and submitted its revised application to the Corps on February 21, 1972.

On February 25, 1972, the Corps issued public notice of the permit application, describing the work as follows: *"Character of Work*: Dredge and maintain an entrance channel from the Pontchartrain and a system of connecting canals. All spoil will be placed on property owned by the applicant and none will be placed in the lake." Leisure obtained from the Louisiana Stream Control Commission, the Louisiana Wildlife and Fisheries Commission and the St. Tammany·Parish Police Jury letters expressing no objection to the issuance of the permit. Subsequently, on March 9, 1973, the Corps, with the concurrence of the Department of the Interior, issued the permit to Leisure.[7] No Environmental Impact Statement was filed concerning the permit. After public notice of Leisure's permit application was made in February, 1972, and prior to the issuance of the permit more than one year later on March 9, 1973, neither plaintiff Jelalian nor any other member of SOWL made any protest, objection, or comment concerning the permit or any other aspect of the project to Leisure, the Corps, the St. Tammany Parish Police Jury, or any other defendant in this lawsuit.

The record indicates that the plaintiffs had knowledge of the Eden Isles project before their suit was filed in October, 1974. Commercial fishermen who are members of SOWL testified before the Magistrate that they knew of the original Drainage District No. 2 and of the subsequent development of Eden Isles. They also testified that they have been unable to fish in the area since 1963, when the area was redrained. Moreover, Mary Halpin, the president of SOWL, testified by deposition that she had been

6. In finding number 30 of his First Supplemental Special Master's Report and Recommendation, the Magistrate stated:

The excavation used six to nine draglines and four to six bulldozers at a time. One dragline had a boom 110 feet long that could be seem five miles away. At times there were two dredges on the job. The equipment was lighted at night, and the large draglines had lights on them. The dredges worked 24 hours a day and were lighted "extremely well" and looked like "floating cities."

The Report also noted that the work was visible from Interstate 10 and Highway 11 in the daytime and at night.

7. The permit did not apply to any portion of Eden Isles East. The permit authorized Leisure "to dredge and maintain an entrance channel, yacht basin, and connecting channel and install and maintain bulkheads, fills, revetments, culverts, and docks, in Lake Pontchartrain and Grand Lagoon . . . ." Thus, although the Corps required Leisure to include the interior canal system in its revised permit application, the permit, as issued, did not cover that system.

aware of the development of Eden Isles for "one or two years."

The defendants presented evidence that the Eden Isles project was substantially complete by late 1974 when the plaintiffs brought this suit. The Special Master determined from the evidence the extent of the work that had been completed in Eden Isles by December 26, 1974, as follows:

| | |
|---|---|
| Unit 1 and 1A | 99% |
| Unit 2 and 2A | 99% |
| Unit 3 | 99% |
| Unit 4 | 53% |
| Unit 5 | 21% |

The Special Master found in his report that 800 to 900 lots and other property, having a value in excess of $18,000,000, had been sold by Leisure subject to its meeting certain improvement and construction obligations with respect to roads, sewerage, water, streets, bulkheads and drainage. He noted further that none of the property owners who had purchased lots from Leisure were parties to this litigation. The Special Master concluded that most of the improvements on Eden Isles had been completed or were near completion when his Supplemental Report was submitted on January 10, 1975. A golf course located on the northern portion of Eden Isles West was 90% complete at that time. In addition, eighteen miles of canals had been dug, and no further canal work was anticipated. The only remaining work involved completion of the construction which had been started on the streets, sewer system, and water systems, as well as completion of the bulkheading on the canals which had been dug. At that time, almost all of the lots bordering on canals in Eden Isles West had been sold to individual purchasers, so that neither Eden Isles nor Leisure had any interest in that property. Although approximately 900

acres remained unsold in Eden Isles West, 52 homes had been constructed in that section.

With respect to Eden Isles East, the Special Master found that Leisure owned only 30% of the land in the section at the time his Report was submitted. The remaining property had been sold, or was under option for sale, to others. The Special Master also concluded that Leisure had no intention of doing any dredging or excavation on the East side and that the only work that Leisure had performed on the East side involved the maintenance of levees.

## II. The Application of Laches.

It is now settled that the equitable doctrine of laches can apply in the context of environmental litigation. *Ecology Center v. Coleman,* 515 F.2d 860, 867 (5th Cir. 1975); *Clark v. Volpe,* 342 F.Supp. 1324 (E.D.La.1972), *affd.* 461 F.2d 1266 (5th Cir. 1972). As indicated in the *Clark* case, there are three independent criteria which must be met before laches can be applied. The defendant must show: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted. Since we conclude that the district court properly applied these standards to the case at bar, we affirm.

### A. Delay.

The plaintiff initiated this action on October 29, 1974. The actions complained of by the plaintiffs occurred at different times during several stages of the Eden Isles development and, consequently, the delays involved in bringing this litigation vary in length depending upon the claims presented. To the extent that the plaintiffs are now challenging the conversion of the Eden Isles property to dry land, they have delayed the longest.[8] The construction of dikes, levees and dams was first completed in 1927. After a lengthy interval when the

---

8. Paragraph 68 of plaintiffs' complaint sets forth the following averments and allegations:

As previously alleged, the St. Tammany Police Jury with the guiding hand of the District Attorney of St. Tammany Parish, began illegal procedures and manuevers [sic] to become the governing authority of Drainage District # 2, and to dyke and drain the area

area was again submerged, it was redrained in the 1960's and, except for a three or four week period in 1974, it has been dry land since 1966. Thus, the construction which most drastically altered the basic character of the area was undertaken many, many years before the instant case was begun.

To the extent that the plaintiffs are challenging the Corps of Engineer's issuance of the permit to Leisure in March, 1973, they are again guilty of delay in asserting their claims. The Corps issued public notice of Leisure's permit application on February 25, 1972. Although the permit was not issued until over one year later, on March 9, 1973, the plaintiffs failed to present comments, make objections or even to ask questions concerning the permit application. Rather, after the permit was issued, the plaintiffs waited until over nineteen months had passed before they brought this action.

### B. *The Delay Was Inexcusable.*

■ The district court concluded that the plaintiff's delay in bringing this action could not be excused. The Special Master had concluded that Eden Isles was a large and highly visible project which could not have escaped public attention. Construction of the canal complex began in 1969 and continued until March, 1973, during which time the work was performed by six to nine draglines and four to six bulldozers at a time. The site was lighted at night and was plainly visible from two major highways. The Eden Isles development was not only physically visible to the general public, including the plaintiffs, the project was highly publicized. Beginning as early as January or February of 1970 and continuing through September, 1974, Leisure spent over $850,000 for advertising by newspapers, television, radio, brochures, pamphlets, magazines and billboards. The Special Master found that the progress of the work continuously appeared in newspapers, with advertisements and maps showing the exact location of Eden Isles on the northern shore of Lake Pontchartrain, and with offers of tours and promotional campaigns.

Despite the extensive advertising and visibility of Eden Isles, the appellants contend that their delay in bringing this litigation is excusable. They argue that the length of their delay, if any, should not be measured by beginning from the point in time when the Eden Isles development became visible and publicly known. Even if they knew or should have known of the development, appellants argue, neither the visibility nor the publicity of the project put them on notice of any illegality upon which this litigation might be based. In his explanation of this position during oral argument, counsel for appellants argued that his clients could presume that the responsible public officials would act in accordance with all environmental and other laws applicable to the Eden Isles development. Essentially, appellants argue that their delay in bringing this case is excusable because they were unaware of any illegality in the Eden Isles project until some unspecified date after Leisure began construction. Without indicating when they believe the delay period for determining laches should have begun to run in this case, appellants' brief contains the following statement:

> Appellants *do not believe* that there was any inexcusable delay or lack of diligence shown on their part. There is no evidence in the record to indicate that Mary Halpin president of SOWL, *was aware that the Eden Isles project was illegal,* one or two years prior to the filing of the lawsuit. The trial counsel for SOWL indicated in his deposition that he had only uncovered information leading to further investigation within the year prior to the filing of the lawsuit. (emphasis added).

■ Until they received an indication to the contrary, appellants were entitled to presume that the public officials responsible

---

of what is now known as Eden Isles. Drainage District # 2 received no permit for the work performed by them in approximately 1927–1929. And the St. Tammany Parish Police Jury received no permit from the United States Army Corps of Engineers to dyke and drain this land in 1964; and are presently still performing illegal operations on the North Shores of Lake Pontchartrain.

for approving the Eden Isles project would act in accordance with the law. *Clark v. Volpe, supra; Environmental Defense Fund v. TVA,* 468 F.2d 1164, 1182 (6th Cir. 1972). The appellants, however, were on notice that construction of the Eden Isles development was well underway even before public notice [9] of Leisure's permit application was issued on February 25, 1972. The appellants, therefore, knew or should have known that the environmental effects of the construction might well occur before the preparation of an environmental impact statement ("EIS") if, indeed, the Corps determined that an environmental analysis would be required.[10] Nonetheless, although appellants could have filed suit attempting to enjoin further construction until such time as an EIS was prepared and the permit was issued, appellants did not file their suit until over two and one-half years later. Given the visibility and publicity of the Eden Isles development, as well as the public notice of Leisure's permit application, we conclude that the plaintiffs' delay in bringing this litigation was inexcusable.

### C. Prejudice to the Defendants.

 The mere lapse of time does not constitute laches. *Natural Resources De-*

*fense Council v. Grant,* 341 F.Supp. 356 (E.D.N.C.1972); *Pennsylvania Environmental Defense Council v. Bartlett,* 315 F.Supp. 238 (M.D.Pa.1970), *affd.* 454 F.2d 613 (3d Cir. 1971). Even an inexcusable delay does not indicate the presence of the third factor required for a defense of laches—undue prejudice to the party against whom the claim is asserted. In assessing the degree of prejudice to the defendants in this case, we are required to balance the equities, considering both the expenditures which have been made by the defendants and the environmental benefits which might result if the plaintiffs are allowed to proceed with this litigation.

The district court found that the defendants had expended over $26,000,000 on the Eden Isles project before the trial of this action. Moreover, large portions of the project had been substantially completed by that time. This case, therefore, is distinguishable from the cases in which the amounts expended were large in absolute terms but represented a relatively small percentage of the total expenditures anticipated.[11] In view of the substantial sums expended and the extent of construction which has been completed on the Eden Isles project, we conclude that preparation of an

9. Notice was given by publishing an announcement of the permit application in certain newspapers and by mailing the announcement to a large number of interested parties who requested such notice.

10. The record indicates that developers sometimes begin construction of an interior canal system before seeking a permit pursuant to Section 10 of the Rivers and Harbors Act. The record contains a letter from the District Engineer of the Corps of Engineers which states as follows:

Under existing policy with respect to "dead-end" canals on upland property, the proponent of canal work which will be connected to navigable waters should submit an application for a permit, including a proposed plan of development, to the applicable Corps District Engineer before commencing any form of excavation work. Where a connection to navigable waters has not yet occurred but the canal construction on the upland *is planned or has already begun,* the District Engineer will, in writing, advise the proponent of *the need for a permit whenever the canal is to be connected to navigable waters,*

ask if he intends to connect to the navigable waters, and request the immediate submission of the plans, including any proposed development, and a permit application if a connection is so intended. If it is determined that a permit will be required, the District Engineer will advise the proponent that any work on the upland will be done at the risk that a permit may not be issued because of the effect that the canal may have on the navigable waters and that the existence of partially completed excavation work will not be allowed to weigh favorably in evaluation of the permit application. (emphasis added).

11. In *Ecology Center of Louisiana v. Coleman,* 515 F.2d 860 (5th Cir. 1975), the defendants had spent $1,000,000 to acquire rights of way for a project which the plaintiffs alleged would cost approximately $667,000,000. The court concluded that laches did not apply because the defendants had not "established prejudice beyond a genuine question to the accomplishment of their statutorily charged duties." Similarly, in *Inman Park Restoration v. Urban Mass Transp. Admin.,* 414 F.Supp. 99 (N.D.Ga. 1976), the court stated:

EIS at this point would produce very little, if any, environmental benefit. This conclusion is also compelled by the testimony of one of SOWL's own witnesses, who concluded that the Eden Isles development would have a minimal environmental impact on the MPCB ecosystem.

■ In light of the plaintiffs' delay in bringing this action, therefore, we conclude that the requested postponement of further construction on this substantially completed project, pending preparation of an EIS, would unduly prejudice the defendants. In so holding, we note that the district court's opinion applies only to the "substantially complete developments outlined in the Special Master's reports" and we concur with the court's conclusion that "any further work that might be contemplated by defendants or third parties at either development is unaffected by this opinion, and would, of course, proceed in accordance with all applicable laws and would be subject to review in the courts."

AFFIRMED.

Although, a great amount of money, time and effort has already been expended, when compared to the total amount to be spent on the MARTA project it represents only a small percentage. Further, since no actual physical construction has commenced on the segments now under dispute, there may still be great environmental benefits to be derived from the litigation of the present actions.