Walter PESHLAKAI, Sr., et al., Plaintiffs,

v.

Charles W. DUNCAN, Jr., et al., Defendants.

Civ. A. No. 78–2416.

United States District Court, District of Columbia, Civil Division.

Sept. 5, 1979.

As Amended Oct. 16, 1979.

---

Bruce J. Terris, Norman L. Dean, Jr., Washington, D.C., for plaintiffs.

Thomas J. Riley and David C. Cannon, Jr., Attys., U.S. Dept. of Justice, Washington, D.C., for defendants.

Herbert S. Sanger, Jr., Gen. Counsel, TVA, Knoxville, Tenn., for TVA.

Peter J. Nickles, Washington, D.C., for Kerr-McGee Nuclear Corp.

Robert P. Cochran, Washington, D.C., for Phillips Uranium Corp.

Daniel Joseph, Randall L. Sarosdy, Washington, D.C., for Mobil Oil Corp.

## OPINION

HAROLD H. GREENE, District Judge.

This action seeks to halt federal approvals for uranium mining and milling activities in the San Juan Basin [1] which accounts for nearly half of the nation's production of uranium and almost three-fifths of its uranium reserves. The activities in question are designed to permit the production of uranium concentrate, commonly called yellowcake,[2] and it is claimed by plaintiffs that they may not be allowed to continue absent the preparation of certain environmental impact statements (EIS). The motion for preliminary injunction presently before the Court directly concerns only one project, the so-called in situ leaching project at Crownpoint, New Mexico.[3] However, several of the theories upon which plaintiffs base their claim for relief on the motion have far broader implications.

Plaintiffs [4] argue that the federal defendants [5] have violated or are about to violate the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., in three major respects. It is claimed, first, that approval of the mining plan for the Mobil [6] in situ project would violate NEPA because such approval would be a major federal action significantly affecting the quality of the human environment on which no EIS has been prepared. Plaintiffs contend,

---

1. The San Juan Basin is located in Northwestern New Mexico and in portions of Colorado and Utah.

2. Yellowcake is the first stage in the manufacture of the fuel used by most nuclear power plants.

3. On this motion, the Court will, of course, apply the standards of *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 104 U.S.App.D.C. 106, 259 F.2d 921 (D.C.Cir. 1958), and *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 182 U.S.App.D.C. 220, 559 F.2d 841 (D.C.Cir.1977).

4. Plaintiffs are Friends of the Earth (an international environmental organization) and 72 individual Navajo Indians residing in the area.

5. The federal defendants are the Department of the Interior, Department of Energy, Department of Agriculture, Environmental Protection Agency, Nuclear Regulatory Commission, and Tennessee Valley Authority.

6. Mobil Oil Corporation has intervened as a defendant. The following private companies also having an interest in mining and milling in the San Juan Basin area have likewise been allowed to intervene as defendants: United Nuclear Corporation, Kerr-McGee Nuclear Corporation, Gulf Oil Corporation, Exxon Corporation, Phillips Uranium Corporation, and Continental Oil Company.

second, that the lease sale underlying the proposed project violated NEPA because neither an EIS nor an environmental assessment (EA) was prepared on that sale. And third, it is argued that approval of the project is part of a number of actions in the San Juan Basin region for which a regional EIS should have been, but was not, prepared. These contentions will be considered seriatim.

I

Mobil's in situ project, located on five acres of land in the Crownpoint area, is a pilot project[7] which has as its purpose the determination whether uranium leaching (also known as solution mining) is feasible in New Mexico.[8] Traditional mining for uranium is carried on underground. Solution mining, most simply described, involves the circulation of water and a chemical solution called leachate[9] to underground areas where the uranium is located by means of a system of injection and production wells. The uranium is oxidized and dissolved underground and brought to the surface as part of a fluid. That fluid is then pumped to an ion exchange column where the uranium is deposited on resin beads through an anion exchange process. The remaining fluid, which no longer contains uranium, is then pumped back underground through the injection wells, with the chemical solution added, in a continuous cycle.

A ten-year lease to the land underlying the proposed in situ project was sold to Mobil by the Bureau of Indian Affairs (BIA)[10] in February 1972. Thereafter, Mobil received approval from the U.S. Geological Survey (USGS) for exploration plans

involving the site. Between 1973 and 1977, Mobil drilled 124 exploration holes in the area, and in May 1978, it applied for approval of a mining and reclamation plan (25 C.F.R. § 177.7). The USGS prepared an environmental assessment, some 164 pages in length, with an appendix consisting of 70 pages. After several layers of review within the Department of the Interior, and based upon that EA, the Department ultimately concluded that a full-fledged environmental impact statement was not required because the pilot project would not have significant environmental impacts. On June 21, 1979, the Secretary of the Interior approved Mobil's mining plan. The motion for preliminary injunction challenges that determination and seeks to halt Mobil's implementation of the permit it received from the government.[11]

II

NEPA requires the preparation of an EIS for every major federal action which may have a significant impact on the quality of the human environment. See *Scientists' Institute for Public Information v. Atomic Energy Commission*, 156 U.S. App.D.C. 395, 404–05, 481 F.2d 1079, 1088–89 (D.C.Cir.1973). Plaintiffs contend that the in situ project is such an action, and they rely on several factors in support of that contention. Before discussing these specific factors, it may be useful to state briefly the standard of review that must be applied by the Court.

The responsibility for making a threshold determination as to whether an EIS is required by NEPA for a particular

7. The project is scheduled to be in operation for only 22 months.

8. While uranium leaching is new to that area, it has been employed elsewhere.

9. The solution consists of an oxidant (hydrogen peroxide) which oxidizes the reduced uranium in the ore zone; bicarbonate which reacts with the oxidized uranium to form a water soluble uranium carbonate compound; and sodium hydroxide which adjusts the pH of the water.

10. The lease was signed by BIA on behalf of one Sarah McCray, a Navajo Indian. While

Ms. McCray contends that the lease was improperly approved by BIA and that Mobil violated the terms of the lease, these issues have been decided against her by an Administrative Law Judge in an Interior Department proceeding, and there is no basis for disturbing that determination.

11. Following the denial of a motion for temporary restraining order, Mobil agreed not to begin operations during consideration by the Court of the present motion.

project lies with the federal agency involved. *Metlakatla Indian Community v. Adams*, 427 F.Supp. 871, 874 (D.D.C.1977); *Hanly v. Mitchell*, 460 F.2d 640, 645 (2nd Cir. 1972). The burden is on plaintiffs to establish that a decision not to require an EIS constitutes a violation of NEPA. *Sierra Club v. Lynn*, 502 F.2d 43, 52 (5th Cir. 1974); *Hiram Clarke Civics Club, Inc. v. Lynn*, 476 F.2d 421, 426 (5th Cir. 1973). Such a decision will be reversed by a court only if it is unreasonable (*Wyoming Outdoor Coordination Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973)) or arbitrary and capricious. *Hanly v. Kleindienst*, 471 F.2d 823, 829 (2d Cir. 1972).[12]

The Supreme Court in two recent decisions has more explicitly defined the role of a reviewing court and the conclusion that emerges from these decisions is that such a court "[must] insure that the agency has taken a 'hard look' at environmental consequences," and that, if it has done so, the agency determination may be reversed only if it is arbitrary. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976); *Vermont Yankee Nuclear Power Co. v. National Resources Defense Council*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); see also, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970).

■ Plaintiffs do not, however, have the burden of demonstrating that a particular federal action will necessarily affect the human environment to a significant extent. They need merely show that such action may have such an effect. *City of Davis v. Coleman*, 521 F.2d 661, 674 n.16 (9th Cir. 1975); *Maryland National Capital Park and Planning Commission v. U. S. Postal Service*, 159 U.S.App.D.C. 158, 168, 487 F.2d 1029, 1039 (D.C.Cir.1973); 40 C.F.R. § 1500.-6(a); 36 Fed.Reg. 19344. But see, note 24 *infra*.

It is with these general principles in mind that the particular claims of plaintiffs must be examined.

■ *Water Quality.* Plaintiffs contend that "excursions" may occur, that is, water may escape from the in situ project site to contaminate the Westwater Canyon aquifer (by horizontal release of fluid) or the Dakota aquifer (by vertical release). However, the record shows that, for a number of reasons, such an event, while it is not impossible, is so unlikely that the probability of its occurring is infinitesimal.

First, more fluid is constantly pumped out of the system than is injected into it.[13] This creates a net inflow of surrounding groundwater into the area and thus has a tendency to confine the leachate to the production zone. Second, hydrology tests simulating the operation of the system conducted by Mobil indicate that the leachate can be confined to that zone. Mobil has performed computer modeling studies for the pilot test, which simulated its underground leachate flow patterns, with the same result. Third, Mobil has had prior experience with the in situ leaching technology in South Texas for a four-year period, and it has never experienced an excursion there. Fourth, six monitor wells will ring the site and samples will be taken periodically to determine whether any leachate might have escaped despite these precautions. The likelihood of detecting an excursion by this method is nearly one hundred per cent, and appropriate remedial action, which has been considered in exhaustive detail, can be taken. Fifth, the water supply of Crownpoint would be unaffected even if all these safety measures failed because the groundwater flow is away from the town rather than toward it. Moreover, according to one study, if the leachate were somehow carried toward Crownpoint, it

---

**12.** There does not appear to be any significant practical difference between the two standards, nor are they in conflict with the doctrine that the burden is on the government to demonstrate that any environmental impacts are not significant. *Maryland National Capital Park and Planning Commission v. U. S. Postal Ser-*vice, 159 U.S.App.D.C. 158, 487 F.2d 1029 (D.C. Cir.1973).

**13.** The proposed injection rate for the pilot project is 73 gallons per minute; the production rate will be 75 gallons per minute.

would take 1,300 years to arrive there [14] and would be rendered harmless long before then.

Plaintiffs argue next in regard to the water quality issue that Mobil will not restore that quality to its former levels after the termination of the test project. The EA has noted that following the 14-month production period, Mobil will be required to restore the aquifer within eight months to the levels set by the New Mexico Water Quality Control Commission regulations,[15] and Mobil will, in fact, do so. This task will be accomplished by a "flushing" operation in which leachate is no longer reinjected underground; water is pumped from the production wells to the surface; it is there treated and purified until it meets the restoration standards; and it is then reinjected into the Westwater formation. The EA has concluded that by this method all the chemicals can be completely removed and the water restored to appropriate levels. Indeed, Mobil has used this same flushing method in its South Texas operation, and the Texas Department of Water Resources considered the restoration there to have been a success.[16] Laboratory tests likewise indicate that the acquifer can be restored to the New Mexico standards, and their results are strengthened by the fact that the inflow of groundwater surrounding the production zone will aid in restoring the acquifer beyond the data those tests were able to take into account.

It is not without significance in this regard that the water in the Westwater formation aquifer is by no means pure crystalline drinking water, but, largely because of the presence of uranium, it even now fails to meet the community water system standards set by the Environmental Protection Agency under the Safe Drinking Water

Act. 42 U.S.C. § 300f et seq. The average gross alpha values and combined total radium-226 and -228 values in that portion of the aquifer underlying the project site are five times the maximum safe limits, and any further deterioration should it occur, contrary to every rational expectation—could hardly be regarded as having a significant impact on the human environment. Finally, it is worth noting that the total amount of water that will be recirculated during the pilot test is one one-hundred millionth of the estimated total water in the Westwater Canyon aquifer, and the amount of water that will be actually withdrawn is one-billionth of the water in the aquifer.

*Radon Gas.* Plaintiffs contend that uranium mining and milling increases the exposure of workers and of the public to potentially harmful radiation. While several possible sources of radiation are mentioned, plaintiffs emphasize especially the emission of radon gas, a decay product of uranium. That contention appears at first blush to be the most serious of those made by plaintiffs. However, upon examination, the radiation threat, too, is realistically nonexistent. According to the interim mining plan, "the maximum . . . additional exposure which might be received from facility operations will . . . add less than one hundredth of one per cent of the ambient radiation background." Or, as that plan also states it, any radon gas from the project "will be undetectable and at no location should exceed one per cent of normal background levels," that is, levels which exist in the atmosphere in any event.[17] Indeed, "the radon . . . [would be] less than one per cent of what could be expected from a conventional uranium mine."[18]

14. Plaintiffs claim that the leachate could reach Crownpoint in 65 years or conceivably even earlier.

15. Restoration to baseline levels is not possible because several constituent chemicals are removed by the process.

16. Plaintiffs' suggestions that the Texas tests are either not reliable or that their results were

not satisfactory are not supported by the record.

17. Because it would not be in an enclosure, even that small amount would be quickly dispersed.

18. The federal defendants aptly point out in their brief (p. 26 note) that plaintiffs' complaint alleges (para. 130(f)) that the final environmen-

*Land Use Impacts.* Plaintiffs argue that yellowcake production will result in surface disturbances, including the construction of roads, the flattening of the drill sites, and the clearing of the surface in the vicinity of the mine and ventilation shafts. These impacts, too, are of minimal significance. The Administrative Law Judge who heard the petition of Sarah McCray to cancel the lease underlying the project determined that all surface areas affected by uranium exploration or production could be reclaimed to a condition at least as good as that existing prior to the start of operations, and that such a reclamation program was already in progress.[19] Irrespective of whether the ALJ's findings should be given collateral estoppel effect as to all plaintiffs,[20] his decision clearly was substantively correct, and plaintiffs have made only a feeble effort to show otherwise.[21]

*Cultural, Religious, and Socioeconomic Impacts.* Plaintiffs next argue that yellowcake production in the area will "wreak havoc" with the culture and religion of the Navajo Indians residing there. Thus, it is said, the Navajo believe that man should maintain proper harmony with the natural world; that mining in the area would destroy places where Navajos pray and the plants they use to heal the sick; and that the plants themselves, in Navajo religious belief, have living spirits. In a somewhat different vein, plaintiffs argue that uranium mining in the area will create thousands of additional jobs and thus will attract may outsiders; and that the Navajos

and others residing in the area would have great difficulty coping with the resulting social and economic disruptions.

Most of the arguments advanced by plaintiff are more appropriately addressed to the regional impacts issue discussed in Part IV *infra*, since the relatively small area involved in the in situ project would have only a minimal impact on Navajo culture in general in any event. However, whether as applied to the in situ project, or on a broader basis, plaintiffs' contentions are unpersuasive.

Sarah McCray claims that various adverse cultural and religious impacts will result on her land on which the in situ project is located. The Administrative Law Judge found her not to be a credible witness, and this court, which heard her testify, concurs in that assessment. Extensive drilling activities were carried out on her property for years without the slightest objection from her. It was only early in 1978 when she made demands which Mobil would not meet that she joined with the organizational plaintiff in opposing the in situ project.

Insofar as broader impacts are concerned, it is worth noting that the Navajo Tribal Council, elected by the Navajos, has not joined in the cultural and religious objections raised by these plaintiffs. See *Johnson v. Chilkat Indian Village*, 457 F.Supp. 384, 389 (D.Alaska 1978); *Tewa Tesuque v. Morton*, 498 F.2d 240 (10th Cir. 1974).[22] In-

tal statement for a conventional underground uranium mining project in the area gave insufficient consideration to the advantages of the in situ leaching alternative; yet here plaintiffs object to a pilot in situ leaching program which is designed to establish the feasibility of that method of producing uranium.

**19.** The ALJ also ruled against Ms. McCray's position with respect to the water quality issue. None of the other issues was raised in that forum.

**20.** See *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Ill. Found.*, 402 U.S. 313, 328–9, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

**21.** On this issue, too, plaintiffs fail to acknowledge that the impacts they complain about are far less significant than would land use impacts resulting from conventional, underground uranium mining. While NEPA applies to all federal actions having substantial impact on the environment, it is not without significance that a particular method of proceeding toward a legally-valid objective has less of an impact that a different, more traditional method.

**22.** It may be that individual Navajos believe that to disturb any plant is to destroy a living spirit; but this would hardly be a valid basis for concluding that federal law prohibits mining, construction, agriculture, and cattle-raising in the areas where Navajos reside.

deed, the supervisory archeologist for the Navajo Nation has stated that her inspection of the area revealed no surface indications of an historic or prehistoric nature, and that Mobil was to be

. . . commended for its care and diligence in assuring protection of such priceless and irreplaceable cultural resources. If all organizations complied with the law as carefully as Mobil, our descendants would have no grounds for complaint about our custodianship of their heritage.

As concerns economic impacts from the in situ project, plaintiffs recognize, as they must, that "the development will also have aspects which could be regarded as positive for the Navajo, primarily in the form of higher income from jobs and, for the allottees whose allotments are to be mined, royalty payments" (Memorandum, p. 20).

The blunt fact is that the economic and social impacts appear to be overwhelmingly favorable, both in terms of creating jobs for an underdeveloped area and for a people badly in need of economic assistance, and in terms of a uranium production technology which is likely to be more humane and less costly than the traditional underground mining technique. These advantages are not offset by the very minor and speculative environmental impacts plaintiffs assert.[23]

The short of the matter is that while plaintiffs have catalogued and described possible environmental impacts at great length, in vivid detail, and with considerable imagination and ingenuity, in the final analysis these impacts amount to very little, both individually and in the aggregate.[24] The Department of the Interior has taken a "hard look" at the in situ project through its lengthy and detailed[25] environmental assessment[26] and it has concluded that a full-fledged environmental impact statement is not required. Moreover, a draft EIS has been prepared for the environmental impacts of uranium development in the Crownpoint area (which will consider, among other things, the environmental impacts of in situ uranium leaching), as well as an EIS for Dalton Pass (located a few miles from Crownpoint) and a generic EIS on uranium milling. Another "hard look" was taken during the administrative hearing in April of this year at which the plaintiffs presented live and documentary evidence without being able to convince the Administrative Law Judge.

Bearing in mind the technical expertise of the Department of the Interior, the lack of real environmental impact, and the fact that an EIS has never been required for a pilot test of solution mining, the Court concludes that the Department's decision not to prepare an environmental impact statement

**23.** Plaintiffs also claim that the in situ project is controversial, suggesting that "controversy, as the term is used in this context, refers only to a dispute over the nature or extent of the environmental impacts of a proposed action" (Reply Memorandum, p. 48). However, it does not appear that a "substantial dispute" exists as to the size, nature, or effect of the in situ project (see *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972)). Moreover, a "controversy" does not exist within the meaning of the law, merely because an opponent of a project raises environmental questions. See *Fund for Animals v. Frizzell*, 174 U.S.App.D.C. 130, 136–37 n.15, 530 F.2d 982, 988–89 n.15 (D.C.Cir.1975). That kind of bootstrap reasoning would permit such an opponent to sidestep his burdens under the law simply by declaring the existence of a controversy. Although the in situ project was publicized, controversy was almost non-existent. As the EA stated (Exh. D–2 at p. 156), "public comment and interest in this project

has been surprisingly low . . . [and no] adverse comments . . . have been received from . . . Navajos. . . ."

**24.** Plaintiffs argue that the measures taken by the government and by Mobil "cannot ensure that no impacts will occur" (Reply Memorandum, p. 36). Defendants are not required to meet such an impossible standard. See *Hanly v. Kleindienst, supra*, 471 F.2d at 830–31.

**25.** Plaintiffs concede that the EA "constitutes an examination in minute detail of the possible impacts of the project" (Memorandum, p. 36).

**26.** While an EA cannot take the place of an EIS where the latter is required, it is not without significance that the EA is longer and more detailed than the guidelines of the Council on Environmental Quality recommend for an EIS. 40 C.F.R. § 1502.7.

for the in situ project was neither unreasonable nor arbitrary and that it must stand.

### III

On February 15, 1972, the BIA conducted a lease sale in which it offered to sell uranium exploration and mining leases on Navajo lands, including the land underlying Mobil's in situ project. Under NEPA, an environmental impact statement would have been necessary for this lease. See *Cady v. Morton*, 527 F.2d 786, 793–4 (9th Cir. 1975); *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972); but see *Sierra Club v. Hathaway*, 579 F.2d 1162 (9th Cir. 1978). The Department of the Interior as a matter of practice now prepares environmental impact statements on similar oil and gas leases. See *Sierra Club v. Morton*, 510 F.2d 813 (5th Cir. 1975); *Alaska v. Andurs*, 188 U.S. App.D.C. 202, 580 F.2d 465 (D.C.Cir.1978); *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368 (2d Cir. 1978). However, Interior did not prepare an EIS, nor did it prepare an environmental assessment to determine whether an EIS was required, and that, too, would be in violation of presently applicable law. · See *Arizona Public Service Co. v. Federal Power Commission*, 157 U.S. App.D.C. 272, 483 F.2d 1275 (D.C.Cir.1973); *Maryland National Capital Park and Planning Commission v. Postal Service*, 159 U.S. App.D.C. 158, 168, 487 F.2d 1029, 1039 (D.C. Cir.1973); 40 C.F.R. § 1508.9.

Thus, a violation of NEPA occurred, and the real issue on this aspect of the case is whether plaintiffs are barred by laches from pressing the point of that violation.

At the time of the original lease sale, the only relevant federal court decision was that of the District Court for the District of New Mexico in *Davis v. Morton*, 335 F.Supp. 1258 (D.N.M.1971) which held that approval of lease sales on Indian lands did not constitute "major federal action" under NEPA, and the Department of the Interior followed that decision. *Davis* was reversed one year later (*Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972)) and the decisions cited

above, supporting the Tenth Circuit followed thereafter. Yet from 1972 until the present controversy arose, plaintiffs did not raise the issue of a possible violation of NEPA by virtue of the lease sale, and defendants accordingly plead laches.

The doctrine of laches applies to NEPA cases (see, *e. g.*, *Save Our Wetlands, Inc. v. U.S. Army Corps of Engineers*, 549 F.2d 1021, 1026 (5th Cir. 1977)), as to other types of litigation, and one element of laches in the NEPA context, as in others, is the length of the delay. *Save Our Wetlands, Inc. v. U.S. Army Corps of Engineers, supra* (two and one-half years); *Organizations United for Ecology v. Bell*, 446 F.Supp. 535, 547 (M.D.Pa.1978) (three years); *Dalsis v. Hills*, 424 F.Supp. 784, 788 (W.D.N.Y.1976) (two and one-half years); *Smith v. Schlesinger*, 371 F.Supp. 559 (C.D.Cal.1974) (seven and one-half months). The delay here, as noted, was unusually long by any standard—seven years.

That delay was also unreasonable. The individual plaintiffs signed the leases and thus they knew of them even before they were approved by the Department of the Interior.[27] To be sure, the organizational plaintiff did not have actual knowledge of the facts until much later. However, as defendants correctly point out, the Friends of the Earth is an international organization with a deep and well-defined interest in environmental matters and extensive resources. Such a group cannot avoid the laches problem for the plaintiffs by the simple expedient of involving itself in litigation at a late stage. See *Sierra Club v. Cavanaugh*, 447 F.Supp. 427, 430 (D.S.D. 1978). Thus, the unreasonableness of the delay must be attributed to all the plaintiffs.

Finally, defendants have suffered substantial prejudice as a result of the delay. Mobil has expended more than $19 million on exploration in the Crownpoint area, including almost $3 million on the lease on which the in situ project is located, all in

27. Sarah McCray's contention that she did not know of the leases until 1978 was properly rejected by the ALJ as incredible. She signed a lease with Mobil in April 1974.

reliance on the validity of the lease. See *Sierra Club v. Cavanaugh, supra; Friends of Yosemite v. Frizzell,* 420 F.Supp. 390, 397 (N.D.Cal.1976).[28] The leases expire in 1982 unless mining operations are begun prior to that time. If the individual plaintiffs are successful in halting the project until the expiration of the leases as a result of this litigation and the inevitably lengthy controversies surrounding the drafting of an environmental impact statement, they will be able to negotiate new leases at that time on the basis of the uranium Mobil discovered at enormous expense. Equity will not permit NEPA to be used as a means of enrichment in this manner. See *Organizations United for Ecology v. Bell,* 446 F.Supp. 535, 547–53 (M.D.Pa.1978); *Centerview/Glen Avalon Homeowners Ass'n. v. Brinegar,* 367 F.Supp. 633, 639–40 (C.D.Cal.1973); *Shiffler v. Schlesinger,* 548 F.2d 96, 104 (3d Cir. 1976); *Sworob v. Harris,* 451 F.Supp. 96, 101–102 (E.D.Pa.1978).

Beyond that, it appears that the government is presently weighing the actual environmental impacts of the in situ project in a variety of ways—through the environmental assessment of the in situ project itself, the draft environmental impact statement of uranium mining for the Crownpoint area, and by other means (see pp. 1255–1256 *supra*). The environmental impact of the lease sales is necessarily subsumed in these efforts, and the failure to prepare an EIS at the time of the lease sale is thus effectively being cured. To halt all activities in the area for several years because seven years ago the government, acting in good faith, failed to prepare an environmental impact statement for the precise area of the lease sales—and even though the in situ project does not, by itself, require an EIS—would not only be to exalt form over substance but would be a wholly inappropriate exercise of the Court's equitable powers. See *Cady v. Morton, supra,* 527 F.2d at 798 n. 12; *State of Alaska v. Andrus,* 188 U.S.App.D.C. 202, 580 F.2d 465 (D.C.Cir.1978).

## IV

The parties devote the bulk of their arguments to the third issue—whether a regional environmental impact statement should have been prepared. In practical terms, that issue may be the most important, for if plaintiffs are correct on that question, uranium exploration and mining activity will have to be halted not merely on the in situ project but in the entire San Juan Basin and possibly beyond, and it will thus, as noted *supra*, effectively end or delay almost half of the nation's uranium production and jeopardize the exploitation of three-fifths of its uranium reserves.[29] While that issue is thus of the most far-reaching practical significance, in legal terms it is more easily disposed of, for it appears to have been largely settled by the Supreme Court in *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Although there are some factual differences between that case and this[30]—differences which plaintiffs assert call for a different result—in my view the holding of *Kleppe* is applicable and controlling here.

The two cases are factually comparable in many ways, this case involving the development of uranium in the San Juan Basin, *Kleppe* the development of coal in the Northern Great Plains Region. There, as here, it was claimed that a regional EIS was required, and indeed the Court of Appeals for this Circuit held with the plaintiffs on that issue. *Sierra Club v. Morton,* 169 U.S.App.D.C. 20, 514 F.2d 856 (D.C.Cir.

---

**28.** Third parties, too, have been injured as a consequence of plaintiffs' delay. Rents have been paid to the Indian allottees for seven years and these allottees may legitimately expect that these payments will continue for at least three additional years. An injunction would destroy that expectation and reliance.

**29.** The lease sale theory, discussed in Part III, *supra*, would have effects almost as dramatic,

as the majority of federal lands leased for uranium mining were leased without either an EIS or an EA.

**30.** Plaintiffs here, unlike in *Kleppe*, have included a challenge to specific mining plans, and they have attempted to assert other factual differences (Reply Memorandum, p. 8 note), but none of them is of any significance.

1975). However, the Supreme Court reversed, laying down precise guidelines with respect to the necessity for regional environmental impact statements. In essence, the Court held that such environmental impact statements are required in two and only two instances: (1) when there is a comprehensive federal plan for the development of a region, and (2) when various federal actions in a region have cumulative or synergistic environmental impacts on a region.

No comprehensive federal plan for the development of the San Juan Basin region exists, and plaintiffs can therefore prevail only if it is found that a number of federal actions in the region have such a cumulative or synergistic effect that a regional EIS is required. Plaintiffs argue in this regard that the following federal actions taken or planned since 1970 in the San Juan Basin Region must be considered as cumulative or synergistic: lease sales by the Bureau of Indian Affairs; approval by the U.S. Geological Survey of a number of exploration plans; acquisition of legal or equitable interests to yellowcake production enterprises by the Tennessee Valley Authority; approval by the Environmental Protection Agency of national pollution discharge elimination systems; approval by the Department of the Interior of uranium and reclamation plans and approval by the same department of prospecting permits leases and rights-of-way; studies by the Department of Energy concerning yellowcake production; and delegation by the Nuclear Energy Regulatory Commission to the State of New Mexico of the power to license various yellowcake production facilities.[31]

The number and variety of these actions appears impressive at first blush, but much less so on closer examination. In the first place, many of plaintiffs' listings are overstated both with respect to the quantity and the quality of the actions.[32] Beyond that, these actions must be considered in the context of both space and time.[33] The area involved is larger than the State of West Virginia; the period involved thus far is nine years, and if the projections with respect to the various proposed actions are taken into account, it will amount to almost thirty years. These two facts alone raise a question whether all of them can be regarded as so related that they are cumulative or synergistic within the meaning of *Kleppe.* Widely scattered actions by six different federal agencies with different statutory programs and purposes taken or planned during a thirty-year span, without any conscious over-all planning, do not necessarily have that character. The Supreme Court emphasized that NEPA "may require a comprehensive impact statement in certain situations where several proposed actions are pending *at the same time* " (427 U.S. at 409, 96 S.Ct. at 2730) and that "when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region *are pending concurrently before an agency,* their environmental consequences must be considered together" (427 U.S. at 410, 96 S.Ct. at 2730)

31. Plaintiffs claim that additional actions are pending. However, according to the Department of the Interior, there are *no* pending uranium lease applications, uranium lease sales, supplemental uranium exploration plans, actions concerning radioactive sources material licenses, actions relating to uranium production goals, and no pending actions related to the construction, operation, or purchase of yellowcake production facilities.

32. Thus, plaintiffs claim that the Department of the Interior has approved 273 exploration plans, but only 47 of these are original approvals, the remainder being supplements or modifications. Similarly, although 402,826 acres of land have been offered for lease bidding (out of

17 million acres in the San Juan Basin), less than 2,400 scattered fractions of acres have suffered any surface disturbance. Again, plaintiffs claim that the Department of Agriculture approved or concurred in over some 83 uranium plans of operation covering an estimated 134,324 acres of the Cibola National Forest. In fact, the Department has approved no mining plans, and the acreage listed is that of the outer geographical boundaries of the activities, not the actual acreage disturbed. See generally, Brief of federal defendants, pp. 38–50.

33. Moreover, several of these actions are overlapping in the sense that they reflect activities of several agencies relating to a single project.

(emphasis added). At a minimum, many more facts must be known before a confident answer can be supplied on the question of whether this is a situation calling for "comprehensive consideration of pending proposals" that are so " 'related' as to require their analysis in a single comprehensive impact statement" (427 U.S. at 410, 96 S.Ct. at 2730).

▮ It is presumably for that reason, among others, that the Court stated in *Kleppe* that the determination of a region, if any, with respect to which a comprehensive treatment of environmental impacts is necessary, requires (427 U.S. at 412–14, 96 S.Ct. at 2731, 2732):

. . . a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies . . . [and that the] determination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies.[34]

The basis for that conclusion is obvious. Again, as the Court explained (427 U.S. at 401–2, 96 S.Ct. at 2726–2727):

In the absence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement. Section 102(2)(C) requires that an impact statement contain, in essence a detailed statement of the expected adverse environmental consequences of an action, the resource commitments involved in it, and the alternatives to it.

Absent an overall plan for regional development, it is impossible to predict the level of coal-related activity that will occur in the region identified by respondents, and thus impossible to analyze the environmental consequences and the resources commitments involved in, and the alternatives to, such activity. A regional plan would define fairly precisely the scope and limits of the proposed development of the region. Where no such plan exists, any attempt to produce an impact statement would be little more than a study along the lines of . . . [an Interior Department study of coal mining activities in the region], containing estimates of potential development and attendant environmental . . . impact statement of the type envisioned by NEPA (footnotes omitted).

The present case illustrates the soundness of that reasoning. Plaintiffs argue that cumulative impacts from uranium mining occur in the "San Juan Basin" region, as they define it (Memorandum, p. 2 n. 2), but they also describe a number of different geographic territories in which impacts are allegedly felt cumulatively. Thus, it is suggested that the appropriate region for measuring cumulative effects would be (1) the San Juan Basin as a whole (see, *e. g.*, Memorandum, pp. 39–42); (2) the "Grants Uranium Belt" (Id. at 13, 23, 29); (3) "northwestern New Mexico" (Id. at 14); (4) the Westwater Canyon Aquifer (Id. at 24–25, 40–41); (5) the town of Crownpoint (Id. at 24–26); (6) New Mexico as a whole (Id. at 33); and (7) Indian Tribal lands (Id. at 43–46). These territories are by no means congruent.[35]

---

**34.** Plaintiffs argue that the Supreme Court meant to leave to federal agencies discretion only with respect to the area relevant to a regional EIS, but not with respect to the question whether a regional EIS should be prepared at all. It is impossible logically to separate one determination from the other. If the agencies have discretion to determine for what region an EIS is required, they must, of necessity, also have discretion to determine that there is no region with sufficient cumulative impacts to require an EIS. See *Texas Committee on Natural Resources v. Bergland*, 573 F.2d 201, 211 (5th Cir. 1978).

**35.** Plaintiffs' exhibits suggest still other possibilities, such as four distinct mining areas within the "Grants Uranium Belt" (P. Exh. 30); two groups of uranium mines of northwest New Mexico joined with much larger areas in adjacent states, designated as the "Colorado Plateau" and "Colorado and the Southern Rockies" (P. Exh. 24); or five "uranium resource regions," including the two listed by the NRC and a "Southern Basin Range," a "Southeastern Basin and Range," and a "Southern Plains" region (P. Exh. 44).

 Thus, the appropriate regions in which to consider cumulative impacts, from uranium mining may be larger or smaller than the San Juan Basin. The government is presently conducting a study of all foreseeable uranium development in the Basin (San Juan Basin Regional Uranium Study, or SJBRUS)[36] in order to determine whether such development calls for an EIS, and if so, for what region. When that study is completed, a determination can be made whether, depending upon the outcome, a decision not to prepare an EIS or to prepare an EIS on a different regional basis than envisioned by plaintiffs is unreasonable or arbitrary. But, bearing in mind that Northwestern New Mexico is and for a substantial period of time has been a heavily-mined coal and uranium region, there is nothing about the in situ project that is so substantively significant[37] that the law must be deemed to mandate that, absent a regional EIS *now*, its operation must be enjoined. In short, plaintiffs have wholly failed to provide a basis for a determination by this Court that the failure thus far to prepare a regional EIS for the San Juan Basin region was arbitrary or unreasonable (*Texas Committee On Natural Resources v. Bergland*, 573 F.2d 201 (5th Cir. 1978))[38] or was not "based on a consideration of the relevant factors" or constituted "a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970).

 Even if it be assumed, *arguendo*, that a regional EIS was required it would not help plaintiffs on the motion for preliminary injunction. The Supreme Court made very clear in *Kleppe* that (427 U.S. at 407–8, n. 16, 96 S.Ct. at 2729 n. 16):

Even had the Court of Appeals determined that a regional impact statement was due at that moment, it still would have erred in enjoining approval of the four mining plans unless it had made a finding that the impact statement covering them inadequately analyzed the environmental impacts of, and the alternatives to, their approval. So long as the statement covering them was adequate, there would have been no reason to enjoin their approval pending preparation of a broader regional statement; that broader statement, when prepared, simply would have taken into consideration the regional environmental effects of the four mining plans once they were in operation, in determining the permissibility of further coal-related operations in the region.

In other words, as long as the environmental treatment of the in situ project was adequate under NEPA, it would not matter even if—contrary to the Court's conclusion herein—a regional EIS would have been required for the San Juan Basin (or indeed for some other region). The reason for that conclusion is again expressed in *Kleppe*. As the Court said (427 U.S. at 414–415, n. 26, 96 S.Ct. at 2732 n. 26):

Nor is it necessary that petitioners always complete a comprehensive impact statement on all proposed actions in an appropriate region before approving any of the projects. As petitioners have emphasized, and respondents have not disputed, approval of one lease or mining plan does not commit the Secretary to approval of any others; nor, apparently, do single approvals by the other petitioners commit them to subsequent approvals. Thus, an agency could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals.[39]

**36.** A regional EIS is not required simply because Interior is engaged in the SJBRUS study. *Kleppe v. Sierra Club, supra,* 427 U.S. at 413, 96 S.Ct. 2718.

**37.** Except for its potentially beneficial effect of reducing the dangers and costs when compared with conventional uranium mining.

**38.** This is the principal post-*Kleppe* decision on regional EIS.

**39.** To be sure, the mining plans in *Kleppe* had received full environmental impact statements, while the in situ project at issue here has received only an environmental assessment. But since nothing more than an EA was necessary

For the reasons stated, the Court finds that the likelihood that plaintiffs will succeed on the merits is minimal. What remains to be considered are the factors of relative injury to plaintiffs, to defendants, to third parties, and to the public as a consequence of a grant or denial of the motion for preliminary injunction.

## V

Plaintiffs' claims of irreparable injury relate to direct physical harm to the environment, the commitment of resources to the in situ project, and denial of their legal rights which NEPA is designed to protect. As the discussion in Part II *supra* shows, the likelihood that cognizable injury to the environment will occur as a result of the pilot project is slight. As for the commitment of additional resources, it is relatively small compared to what Mobil and others have already committed, and if, contrary to present expectations, plaintiffs should ultimately prevail on the merits, there is no reason why the project could not as easily be halted then as now. And in the present context, at least, a claimed violation of NEPA rights alone is insufficient to overcome the other considerations. See *State of Alaska v. Andrus, supra; New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 753–56 (2d Cir. 1977); *Concerned About Trident v. Rumsfeld*, 180 U.S.App.D.C. 345, 358, 555 F.2d 817, 830 (D.C. Cir. 1977).

Injury to defendants is likewise adequately discussed above, and there is no need to repeat that discussion here. However, it is appropriate to consider the question of injury to third parties and to the public interest.

Both in their principal brief and in their reply brief, plaintiffs' discussion of the reasons why the public interest might favor the issuance of preliminary injunction is devoted entirely to the proposition that, since Congress enacted NEPA, the public interest is served by compliance with NEPA. See Memorandum, p. 86, Reply Memorandum, pp. 62–64.[40] That much is certainly true, but it does not represent the entire picture.

For example, as some of the intervenors point out, the Navajos have one of the lowest median incomes of any identifiable ethnic group, amounting to approximately 28 per cent of the national average, and unemployment among them is around 40 per cent. Should uranium mining proceed, not only would many Navajos receive substantial royalty payments, but they would have the right of first refusal on between 80 to 100 per cent of mine and mill operating jobs. Indeed, it is expected that Navajo employment in connection with mining is expected to rise from 196 in 1975 to over 3,000 by 1990.

It is also significant that solution mining would seem to be far preferable to underground mining in socioeconomic terms, for it would eliminate much of the dangerous[41] and backbreaking labor deep in the earth, and provide instead far more humane above-ground employment with similar end results.[42] Whatever may be the legitimate priorities of the organizational plaintiff with respect to these issues, it is doubtful that the social or economic interests of the people on the ground, or the public interest, would be served by a halt of this technology during its relatively modest experimental stage.

Plaintiffs suggest that if all development were enjoined until various environmental impact statements are prepared "this

---

(see Part II *supra* ), this is a distinction without a difference. The *Kleppe* projects appropriately required a massive, six-volume impact statement, while the Mobil in situ project is severely limited both in time and impact.

**40.** Plaintiffs do, however, attempt to answer the public interest arguments made by defendants and the intervenors.

**41.** Underground mining dangers result both from the insecure location and the presence of significant radiation exposure.

**42.** Additionally, solution mining uses far less water than underground mining; it avoids environmental damage resulting from the waste deposited by underground mining; it is less costly; and it offers the potential for the recovery of more uranium.

should not take more than approximately a year to complete" (Reply Memorandum, p. 62), and that domestic sources of uranium are adequate for supplying the nation's nuclear generating plants through 1985. Intervenors, on the other hand, speculate that it is likely to take two to three years to prepare a regional EIS (Brief of United Nuclear Corporation, p. 4). Whatever be the correct projection, the margin is clearly a precarious one, and the possibility that a significant portion of the nation's power plants may be shut down for lack of fuel [43] must obviously be accorded substantial weight on any balancing of relative injuries and equities. See *Concerned About Trident v. Rumsfeld*, 180 U.S.App.D.C. 345, 359, 555 F.2d 817, 831 (D.C. Cir. 1977) (Leventhal, J., concurring); *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir. 1977).

A unanimous Supreme Court said in *Vermont Yankee Nuclear Power Corp. v. NRDC, supra*, 435 U.S. at 557–8, 98 S.Ct. at 1219:

> Nuclear energy may some day be a cheap safe source of power or it may not. But Congress has made a choice to at least try nuclear energy, establishing a reasonable review process in which courts are to play only a limited role. The fundamental policy questions appropriately resolved in Congress and in the state legislatures are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action.

NEPA represents a congressional judgment that legitimate environmental concerns must be addressed and the appropriate procedures be followed in the case of major federal actions which may have a significant impact on the human environment. However, in terms of the public interest, NEPA concerns are entitled to priority only to the extent that they are not insubstantial. When consideration is given, in a public interest context, to the deference that should be paid to less weighty environmental concerns, it is appropriate also to consider whether the effect of a NEPA injunction would be to vitiate other congressionally-mandated policies. Notwithstanding the length and detail of plaintiffs' arguments, when all is said and done, the conclusion that emerges is not that actions in violation of NEPA have been taken or are imminent, but that plaintiffs would prefer it if the production of uranium were stopped.[44] But that, as the Supreme Court said, is a matter for the Congress, not the courts.

For the reasons stated, plaintiffs' motion for a preliminary injunction will be denied.

---

**43.** Nuclear energy now supplies 12.5 per cent of the nation's electricity (D's Exh. 8, vol. 2, p. 135).

**44.** See, *e. g.*, notes 18, 21, 41, 42.